Robert GAVALIK, Frank Grelo, Joseph Urban, Anthony Ulyan, Donald A. Berger, Ronald Clarke, Henry Foster, George Patterson, Joseph Kellerman, Robert Pavlik, Phillip Farley, Thomas Riley, Thomas Warren and Francis Humenik

v.

CONTINENTAL CAN COMPANY.

Albert J. JAKUB, Fred Cipriana, Jr., Anthony J. Bernardo, Thomas A. Mulligan, William T. Tarr, Donald W. Roberts, Ernest Wirbecki and George W. Stepanic on behalf of themselves and others similarly situated Alfred Borrelli, Jr., Michael Di Iorio, Anthony Folino, Thomas E. Johston, Robert Kapolka, John C. Kincel, Peter A. Rumain, Harry H. Smith, Melvin J. Smith, Jack A. Stull and Ernest B. Taddeo, on behalf of themselves and others similarly situated

v.

CONTINENTAL CAN COMPANY, a member of Continental Group, Inc.

Appeal of Robert GAVALIK, et al. and Albert J. Jakub, et al.

Appeal of CONTINENTAL CAN COMPANY, U.S.A., a member of the Continental Group, Inc.

Nos. 85-3597, 85-3615.

United States Court of Appeals, Third Circuit.

Argued June 6, 1986.

Decided Feb. 19, 1987.

Rehearing and Rehearing In Banc Denied Feb. 19, 1987.

Michael H. Gottesman, (Argued), Bredhoff and Kaiser, Washington, D.C., Roslyn M. Litman, Litman, Litman, Harris & Brown, P.A., Pittsburgh, Pa., for Robert Gavalik, et al. and Albert J. Jakub, et al.

Samuel W. Braver, James D. Morton, (Argued), Buchanan Ingersoll, Professional Corp., Pittsburgh, Pa., Eugene L. Stewart, (Argued), Stewart and Stewart, Washington, D.C., for Continental Can.

Before ADAMS,* WEIS and HIGGINBOTHAM, Circuit Judges.

## OPINION OF THE COURT

A. LEON HIGGINBOTHAM, JR., Circuit Judge.

This litigation originated in two separate class actions, *Gavalik, et al. v. Continental Can Co.*, C.A. No. 81–1519, filed September 18, 1981, and *Jakub, et al. v. Continental Can Co.*, C.A. No. 82–1995, filed September 27, 1982, alleging that the institution and implementation of a "liability avoidance" scheme by Continental Can ("Continental") operated to prevent employees from attaining eligibility for employee benefits in violation of § 510 of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1140 (1982).[1] The cases were consolidated on January 17, 1984, and a single class action was certified. The trial of the consolidated action was bifurcated on the issues of liability and damages. The liability phase of the litigation commenced on July 22, 1985, and concluded on August 8, 1985. On September 24, 1985, the district court entered judgment for the defendant, and the plaintiffs appealed to this Court. Continental has cross-appealed asserting that plaintiffs' claims before the district court were barred by the applicable statute of limitations and/or plaintiffs' failure to exhaust their administrative remedies. We reject the contentions of the cross-appeal, and because we find that the district court misallocated the burdens of proof, we will reverse and remand for proceedings consistent with this opinion.[2]

## I.

## BACKGROUND FACTS

Continental Can is a corporation principally engaged in the business of manufacturing cans. Appellants and the class they represent[3] are former employees of Continental's Pittsburgh plant, which is the focus of this litigation. During the relevant period, appellants were all members of Local 4337 of the United Steelworkers of America, AFL–CIO ("USW"), which was their recognized collective bargaining agent.

In 1977, Continental and the USW negotiated a collective bargaining agreement under which Continental was to provide a comprehensive employee benefit plan. As part of this benefit package, Continental agreed to provide two pension plans for employees who experience a break in continuous service of at least two years.[4] Under the "70/75 pension," an employee could qualify for pension benefits before reaching age sixty-two, if s/he either (a) had at least fifteen years of continuous service,[5]

---

\* Honorable Arlin M. Adams, United States Circuit Judge, was present when this case was heard, but did not participate in the decision.

1. Section 510 provides, in pertinent part:
 **Interference with protected rights.**
 It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan....
 29 U.S.C. § 1140 (1982).

2. The parties have diligently advanced several positions in support of their various claims, some of which are not discussed in the text of this opinion. We have fully considered all arguments raised but have limited our discussion to those we deem central to our holding in this case.

3. The class certified by the district court consists of:
 all Continental employees who did not achieve eligibility for Rule of 65 or 70/75 pension benefits who were determined by Continental to be permanently laid off in 1976, 1977 or 1978 because of Continental's decision to cap the Pittsburgh plant, including but not limited to all employees whose names fall below Francis Conti's on Continental's seniority roster.
 Jt.App. at 175.

4. Continental's employee benefit plan also provided vision, health, life and disability insurance benefits, supplemental unemployment benefits, and vacation and wage benefits. *See* Findings of Fact ("FF") 23–27.

5. Regular continuous service commenced on the day an employee was hired. A break occurred if the employee was absent for more than two years due to (a) layoff, (b) approved

was fifty years of age or older and had combined age and service equal to or more than seventy years; or (b) had at least fifteen years of continuous service and combined age and service equal to or more than seventy-five.[6] The "Rule of 65" pension[7] was paid to employees with at least twenty years of continuous service on the last day worked, whose combined age and years of service was equal to sixty-five or more but less than seventy-five. Although the 70/75 pension plan had been in effect since 1971, the Rule of 65 was first formally proposed by the USW during the 1977 negotiations.[8] Continental's obligation to pay 70/75 and Rule of 65 benefits under the agreement arose when employees, after attaining the requisite eligibility, experienced at least a two-year break in service as the result of a plant shutdown, involuntary layoff or absence due to physical disability. For the purposes of entitlement to these benefits, years of service included the first two years following a layoff. This method of calculation was known as the "creep." Under the creep, recall of a laid off employee for even one day commenced a new two-year continuous service period. See FF 20, 38. Under the 70/75 pension plan, an employee could creep into the necessary age and service requirement. Under the Rule of 65 plan, an employee could creep only into the age requirement. See FF 21–22.

In addition to the break-in-service pension benefits, USW and Continental in 1977 negotiated a change in the seniority system. Prior to the negotiations, the Pittsburgh plant had operated under a departmental seniority system.[9] In April of 1977, Continental officials had initiated meetings with USW officials to discuss the possibility of implementing plant-wide seniority[10] at the Pittsburgh plant. That summer, local union representatives at the Pittsburgh plant met with Continental officials to negotiate the plant-wide seniority system. USW favored the change over to plant-wide seniority for two reasons: the departmental seniority system had elicited charges of discrimination by the Equal Employment Opportunity Commission (EEOC), and the plant-wide seniority system would provide maximum job security for its most senior employees. See FF 73. Continental favored plant-wide seniority because it would enable the company (1) to retain its most senior and skilled employees; (2) to retain

---

leave of absence, (c) physical disability, or (d) permanent plant shutdown where the employee did not elect to receive severance allowance. See FF 19.

6. Ordinarily, at age sixty-two an employee who had completed ten years of credited service could elect to retire and receive a normal pension. The normal pension consisted of an initial lump sum allowance, covering the first three months of retirement, with subsequent monthly payments based on years of service and job classification. See FF 9. The 70/75 pension was equal to the normal pension plus a monthly supplement that continued until the employee became eligible for Social Security.

7. This benefit was equal to a normal pension, reduced by the amount of income earned by the employee during layoff. See FF 15.

8. Although the Rule of 65 pension plan was first formally proposed by the USW in October 1977, Continental bargaining officials knew prior to the commencement of the 1977 negotiations that the USW would demand the Rule of 65 plan. The steel, aluminum and can industries engage in "pattern bargaining," whereby the same terms, benefits and conditions adopted by the USW and any of these industries is usually requested in the other industries. USW had negotiated a Rule of 65 pension plan with the steel industry in April of 1977 and the aluminum industry in May of 1977. Prior to the negotiations with the can industry, Continental was provided with a copy of the steel industry's agreement from the USW. Although many of the details of the Rule of 65 plan were unavailable, Continental was aware that it involved a twenty-year service requirement and that payments thereunder would be triggered in the event of a plant shutdown or extended involuntary layoff. See FF 80–83.

9. Under departmental seniority, each department constitutes a separate unit within a plant. An employee's length of service in one department under this system has no bearing on his or her competitive seniority in another department. As a result, under departmental seniority employees with greater seniority could be laid off in one department while employees with fewer years of service were retained in another. See FF 71.

10. Under plant-wide seniority, an employee with greater seniority has work priority over any employee throughout the plant who has less seniority. See FF 72.

employees with vested 70/75 and Rule of 65 pension benefits; and (3) to lay off junior employees whose benefits had not yet vested. *See* FF 74. Ultimately, on October 28, 1977, Continental and the local union formally agreed to institute a plant-wide seniority system at the Pittsburgh plant effective November 1, 1977. *See* FF 112–13, 118, 122.

## A. The "Liability Avoidance" Program

In the mid–1970s, Continental began experiencing a steady decline in business. This decline was principally a result of new manufacturing processes that required fewer plants, the increasing use by the can industry of composite materials and aluminum instead of steel to produce cans, and a growing trend among Continental's customers to begin to manufacture their own cans. *See* FF 31–32. Continental, as part of an effort to control and reduce its anticipated costs in light of its declining business,[11] in 1976 devised a "liability avoidance" program.[12] In order to implement effectively this program, Continental developed an intricate system called the Bell System. The concept component of the Bell System, Bell I, had two complementary objectives: to identify Continental's unfunded pension liabilities so as to avoid triggering future vesting by placing employees who had not yet become eligible for break-in-service on layoff, and to retain those employees whose benefits had already vested. *See* FF 53, 59, 68.

Under Bell I, Continental developed a "cap and shrink" program. It defined a "cap" as a workforce reduction designed to reduce unfunded liabilities; a "shrink" was a workforce reduction resulting from market or manufacturing conditions. *See* FF 54. The decision whether to cap a particular plant was made on the basis of a variety of economic factors at the plant, including its potential employee benefits costs. The determination of an actual cap level was based on Continental's assessment of the needed level of production to meet projected sales.[13] The cap-line limited employment to a specific name on the seniority roster[14] and was effective for five years. Employees below the cap-line, whether then at work or on temporary layoff, were designated as "permanently laid off," and could not be recalled for five years[15] except under extreme circumstances, and then only with prior approval from the highest level of Continental's management. *See* FF 54–57. These employees were not informed by Continental that they would not be recalled.

To further effectuate the goals of the Bell System, Bell II instructed plant managers to adjust their business volume to the desired level of employment. In accordance with this plan, plant managers were authorized to shift business to plants that either had low unfunded pension liability or plants that needed the work in order to retain employees with vested 70/75 benefits. *See* FF 61, 63; Jt.App. at 1367. In addition, Bell II produced and employed

11. In 1972 and again in 1976, Continental created reserve funds to cover its anticipated costs (including employee benefits such as continued insurance coverage, supplemental unemployment benefits and 70/75 pensions) in the event, *inter alia,* of a plant shutdown. The 1972 reserve—the Extra Charge Authorization ("ECA") —consisted of $231 million at the time of creation. By 1976, however, the ECA had been substantially consumed. The 1976 reserve—the Plant Utilization Program ("PUP")—was established in an amount in excess of $100 million. *See* FF 43–45.

12. Continental so labeled the program in its internal memoranda. *See* FF 68.

13. Prior to the institution of the cap program, the employment level was based on projections

of the required manpower needed to produce anticipated volumes of Continental products. After the cap program was adopted, the volume of business was tailored to meet the predetermined desired level of employment. *See* FF 60–61.

14. The cap-line did not determine the actual number of employees working at a given point in time. As employees within the capped workforce died, quit or retired, the number of employees actually on the job decreased. Thus, the cap-line merely divided those employees eligible for work under the liability avoidance program from those designated as permanently laid off. *See* FF 66; Jt.App. 1074; 340–41.

15. Under the USW contract, employees lost all rights to recall after five years.

scattergraphs—computerized charts that listed the age and service of Continental employees at a given time—to identify the unfunded 70/75 and Rule of 65 liabilities and to ascertain when payments under those plans would be triggered. By looking at a scattergraph, a plant manager could determine the number of USW employees whose rights for 70/75 and Rule of 65 benefits had already vested and those whose rights had not yet vested.[16] *See* FF 64.

Finally, in April of 1977, a "liability avoidance tracking system"—the "Red Flag" System—was instituted in order to prevent inadvertent recalls of employees designated as permanently laid off. Red Flag was tied to Continental's payroll system and was designed to generate automatically a red flag report to alert top Continental officials whenever a permanently laid off employee received a pay check either for actual hours worked or vacation. *See* FF 69–70.

## B. *The Pittsburgh Plant and the Closing of the Pail Line*

Like Continental's overall situation, the Pittsburgh plant experienced a significant decline in business in the mid–1970s. As a result, a number of the plant's production lines were closed, and, in 1975, the Pittsburgh plant became a service center, producing parts for other plants, instead of a factory that made and assembled the entire can. Pittsburgh's pail line, which manufactured large gallon steel containers, however, remained in operation. In 1975, the pail line was designated as a separate plant in order to determine its profitability. Despite the separate designation, the Pittsburgh plant and the pail line continued to share a seniority roster. *See* FF 91–93.

Sometime in 1976, the Pittsburgh plant was selected, in part because of its poten-

tially high unfunded liability costs, as a "concept development" plant for implementing Continental's liability avoidance program. *See* FF 62; Jt.App. 1385. In June of 1976, Continental's Executive Vice President and General Manager of Continental Can Company, USA, Donald Bainton, approved a cap for the Pittsburgh plant of 574 USW employees, to be achieved by the end of 1976, and a second cap of 417 USW employees, to be achieved by the end of 1977. Subsequently, in January of 1977, a Continental official indicated that the "ideal cap level" for the Pittsburgh plant, "disregarding volume assumptions and other factors except long range people liability costs," i.e., unfunded pension liabilities, was 392 USW employees as opposed to the previous recommendation of 417 USW employees. *See* Jt.App. 1250. A cap was not set for employees represented by the other two unions at the Pittsburgh plant.

In early 1977, the manager of the pail line recommended moving the operation to a new location in order to increase its profitability. By the summer of 1977, Continental officials had decided to close the pail line. *See* FF 105. This decision was based in part on Continental's desire to prevent employees from attaining eligibility for 70/75 and Rule of 65 benefits. Continental also considered the pail line's unprofitability at the Pittsburgh location in determining that it should be closed. *See* FF 101–02, 105–07.

In the summer of 1977, Continental informed the USW and the Pittsburgh local union representatives of its decision to close the pail line. During this time Continental was also pursuing an agreement to implement a plant-wide seniority system at the Pittsburgh plant. In exchange for Continental's promise to use its best efforts to retain employees with twenty years or

---

**16.** The Inter Plan Job Opportunities ("IPJP") potentially complicated the plant managers' determination of which employees were in the vested or non-vested categories. Under the collective bargaining agreement, USW employees laid off from one plant could transfer to another plant where they had preferential hiring rights. Thus, an employee on permanent layoff status at one plant could in fact continue working in another plant. The requirement that an employee permanently laid off not be recalled for five years, however, directly coincided with the five-year limitation on an employee's preferential recall rights under the collective bargaining agreement. *See* FF 67.

more of service, the local union agreed to plant-wide seniority. Thereafter, a twenty-year cap-line was drawn under the name of Francis Conti. The 417 USW employee cap for 1978 was increased to 472, which included 436 USW employees above Conti or the twenty-year cap-line, and 36 skilled employees below the cap-line. *See* FF 117–122. The pail line was closed after Continental and the union formally agreed to implement plant-wide seniority, resulting in the elimination of one-hundred and eleven jobs. *See* FF 132–133.

## II.

### PROCEDURAL HISTORY

In the proceedings before the district court, the appellants, all of whom were permanently laid off from the Pittsburgh plant between January 1976 and May 1978,[17] challenged both Continental's adoption and implementation of its liability avoidance program at the Pittsburgh plant and its closure of the pail line at the Pittsburgh plant. The *Gavalik* action alleged, *inter alia*, that the closure of the pail line was designed to prevent class members from achieving eligibility for 70/75 and Rule of 65 pension benefits in violation of § 510 of ERISA. Discovery in *Gavalik* brought to light the liability avoidance program, and the subsequent *Jakub* complaint challenged the adoption and implementation of the overall liability avoidance program as a deliberate effort to manipulate plaintiffs' length of employment in order to deprive them of 70/75 and Rule of 65 pension benefits, all in violation of § 510.

After a bench trial, the district court entered an order granting judgment for Continental. In its accompanying, extensive findings of facts, the court found that Continental's liability avoidance program was adopted and implemented in order to avoid future vesting of break-in-service pension benefits. *See* FF 53, 68. The court further found that the subsequent decision by Continental to cap the Pittsburgh plant, which resulted in the layoff of individual and class plaintiffs, and its decision to close the pail line, were motivated in part by the desire to prevent employees from attaining eligibility for 70/75 and Rule of 65 benefits and in part by the declining business conditions at the Pittsburgh plant. *See* FF 106–07, 141–42. The district court concluded, without explanation, that Continental's actions did not violate § 510 of ERISA. *See* Conclusions of Law ("CL") 4–5.

On appeal, appellants allege that the district court erred in concluding that its own findings of fact did not establish a class-wide violation of § 510 of ERISA; that the court erroneously remitted the determination of whether individual class members' layoffs were caused by the liability avoidance program to the liability phase of the bifurcated trial; that, in any event, having found that appellants' layoffs were the consequence of mixed motives, the court erred in its allocation of the "but for" burden of proof; and that the critical findings of the district court were clearly erroneous. Continental has cross-appealed alleging that appellants' action before the district court was barred (1) by a two-year statute of limitations or, alternatively, a six-month limitations period, and (2) for failure to exhaust grievance and arbitration procedures. We shall address the cross-appeal first.

## III.

### THE CROSS–APPEAL

A. *Statute of Limitations*

1.

Continental advances several arguments that, it maintains, require application of a

---

17. As to the lead plaintiffs in the consolidated actions, the district court found that Robert Gavalik was laid off on January 1, 1978, at which time he was forty years old and had nineteen years and seven months of service; Albert Jakub was laid off on December 22, 1977, at which time he was forty-four years old and had nineteen years and seven months of service with Continental. In addition, the district court found age and service at the time of layoff for the following plaintiffs: Francis Humenik, age forty-one, two weeks short of attaining twenty-year service; Thomas Riley, age thirty-nine and sixteen days short of attaining twenty-year service; and Anthony Folino, age forty-four, eighteen years and eight months of service. *See* FF 136–140.

shorter period of limitations than applied by the district court. First, Continental argues that subsequent judicial developments require that a two-year statute of limitations be applied to appellants' claims. Alternatively, Continental urges the application of a six-month limitation period pursuant to the Supreme Court's decision in *DelCostello v. International Bhd. of Teamsters*, 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983).

■ Section 510 of ERISA, 29 U.S.C. § 1140 (1982), and the applicable enforcement provision, 29 U.S.C. § 1132 (1982), do not provide a specific statute of limitations for actions alleging violations of § 510. Under such circumstances, the appropriate period is determined by reference to the state statute of limitations governing cases most analogous to the cause of action asserted by the plaintiffs. *See Wilson v. Garcia*, 471 U.S. 261, 266–67 & n. 12, 105 S.Ct. 1938, 1942 n. 12, 85 L.Ed.2d 254 (1985). The district court determined that appellants' allegation of a § 510 violation was most analogous to a claim of employment discrimination or breach of fiduciary duty, and that on either theory the six-year residuary period of limitations set forth in 42 Pa.Cons.Stat.Ann. § 5527(6) (Purdon 1982) was applicable. Continental does not challenge on appeal the district court's determination that appellants' § 510 action is analogous to an employment discrimination action.[18] Instead, Continental, accepting the district court's determination is correct, argues that the applicable limitation period is nonetheless two years. We reject Continental's contention.

■ Continental seeks to discredit the district court's determination that a six-year statute of limitations applies to the instant action because it specifically relied on this Court's decision in *Knoll v. Springfield Township School District*, 699 F.2d 137 (3d Cir.1983), *cert. granted*, 468 U.S. 1204, 104 S.Ct. 3571, 82 L.Ed.2d 870 (1984) ("*Knoll I*"), which was subsequently va-

cated by the Supreme Court in light of its decision in *Wilson v. Garcia*, 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985), *see Springfield Township School District v. Knoll*, 471 U.S. 288, 105 S.Ct. 2065, 85 L.Ed.2d 275 (1985) (per curiam), and modified by this Court. *See Knoll v. Springfield Township School District*, 763 F.2d 584 (3d Cir.1985) ("*Knoll II*"). This Court's modification in *Knoll II*, however, did not effect a change in Pennsylvania law, under which state law claims analogous to employment discrimination and wrongful discharge claims are governed by a six-year limitation period. *See e.g. Skehan v. Bloomsburg State College*, 503 A.2d 1000 (Pa.Commw.1986) (applying six-year statute of limitations to plaintiff's employment discrimination claim); *see also Ulloa v. City of Philadelphia*, 95 F.R.D. 109, 114 (E.D.Pa.1982) (collecting cases).

In *Wilson v. Garcia*, the Supreme Court considered the question "whether all § 1983 claims should be characterized in the same way for limitations purposes." 471 U.S. at 271, 105 S.Ct. at 1945. Upon analysis of the legislative history and statutory goals of § 1983, the Court concluded that a uniform time limit for *all* § 1983 actions—regardless of the nature of the precise claim—must be applied in each state. *Id.* at 275, 105 S.Ct. at 1947. The Court further concluded that § 1983 actions are best characterized as personal injury actions for limitations purposes. *Id.* at 276, 105 S.Ct. at 1947.

Notwithstanding the *Garcia* Court's repeated references to the particular purposes of § 1983, Continental argues that, in effect, the holding in *Garcia* established that all claims analogous to a charge of employment discrimination must be governed by the state's statute of limitations period for personal injury. We disagree. Indeed, the facts of *Garcia* itself simply belie Continental's contention. In the underlying action in *Garcia*, respondent sought damages for an alleged unlawful

---

**18.** Continental did argue before the district court that appellants' action was more analogous to an action for intentional interference with contractual relations and therefore was

subject to a two-year limitation period. This claim was rejected by the district court. *See* Jt.App. at 171.

arrest and brutality of the arresting officer. In reaching its conclusion that § 1983 actions should be governed by state personal injury limitations periods, the court made no determination that the individual claims themselves were always most closely analogous to personal injury claims. Indeed, the court recognized that "the § 1983 remedy encompasses a broad range of potential tort analogies, from injuries to property to infringements of individual liberty," but concluded that

> [t]he unifying theme of the Civil Rights Act of 1871 is reflected in the language of the Fourteenth Amendment that unequivocally recognizes the equal status of every "person" subject to the jurisdiction of any of the *several States. The Constitution's command is that all "persons"* shall be accorded the full privileges of citizenship; no *"person"* shall be deprived of life, liberty, or property without due process of law or be denied the equal protection of the laws. A violation of that command is an injury to the individual rights of the person.

*Garcia,* 471 U.S. at 277, 105 S.Ct. at 1948 (emphasis in original).[19]

On remand and in accordance with *Garcia,* we followed the Supreme Court's

"bright-line approach to the problem of determining what statute of limitations should be applied in § 1983 actions," *Knoll II,* 763 F.2d at 585, and held that in Pennsylvania the two-year statute of limitations for personal injury actions must govern all § 1983 actions despite the topical nature of the claim. *Id.* Neither *Garcia* nor this Court's decision in *Knoll II* render the district court's determination that appellants' § 510 action most closely resembles an employment discrimination claim erroneous. Nor do they affect this Court's consistent rulings that employment discrimination or wrongful discharge claims brought under federal law are governed by Pennsylvania's six-year residuary clause. *See Fitzgerald v. Larson,* 741 F.2d 32, 35 (3d Cir.1984), *vacated,* 471 U.S. 1051, 105 S.Ct. 2108, 85 L.Ed.2d 474 (1985); *Perri v. Aytch,* 724 F.2d 362, 368 (3d Cir.1983); *Knoll I,* 699 F.2d at 145.[20] *Cf. Al-Khazraji v. Saint Francis College,* 784 F.2d 505, 513 (3d Cir.), *cert. granted in part,* —— U.S. ——, 107 S.Ct. 62, 93 L.Ed.2d 21 (1986) *("Davis v. United States Steel Supply,* 581 F.2d 335 (3d Cir.1978), made it absolutely clear that the six-year limitations period for contract actions applied to Section 1981 actions brought to redress employment discrimination.") In sum, *Garcia* and *Knoll II* apply

---

**19.** Moreover, in vacating this Court's decision in *Knoll I,* the Supreme Court remanded the appeal to us in light of its holding in *Garcia* that "all § 1983 claims should be characterized for statute of limitations purposes as actions to recover damages for injuries to the person." *Springfield Township School Dist. v. Knoll,* 471 U.S. 288, 105 S.Ct. 2065, 85 L.Ed.2d 275 (1985) (emphasis added).

**20.** We recognize that the cases cited for the proposition that federal actions brought in Pennsylvania alleging employment discrimination or wrongful discharge are governed by a six-year limitation period predate the Supreme Court's decision in *Garcia.* We emphasize, however, that *Garcia* did not affect the underlying characterization of "the essential nature of the federal claim within the scheme created by the various state statutes of limitation." *Davis v. United States Steel Supply,* 581 F.2d 335, 337 (3d Cir.1978), *resubmitted,* 688 F.2d 166 (3d Cir. 1982), *cert. denied,* 460 U.S. 1014, 103 S.Ct. 1256, 75 L.Ed.2d 484 (1983). Rather, *Garcia* held that, regardless of that characterization, for pur-

poses of § 1983, the state limitations period for personal injury claims would govern. *See also Knoll II,* 763 F.2d at 585 ("In *Wilson v. Garcia,* the Court held that even though constitutional claims alleged under § 1983 encompass numerous and diverse topics and subtopics, the state statute of limitations governing tort actions for the recovery of damages for personal injuries provides the appropriate limitation period."). In effect, *Garcia* renders the initial characterization of a claim under § 1983 unnecessary. *Garcia* cannot be read, however, to eliminate the "settled practice," to which the Supreme Court refers in the course of its opinion, of adopting a local time limitation which governs state actions most analogous to the federal claim when Congress has failed to provide a specific time limitation. *Garcia,* 471 U.S. at 266, 105 S.Ct. at 1942; *cf. DelCostello v. International Bhd. of Teamsters,* 462 U.S. 151, 171 (1983) ("We stress that our holding today should not be taken as a departure from prior practice in borrowing limitations periods for federal causes of action, [even where] ... state law fails to provide a perfect analogy.")

only to discrimination claims under § 1983.[21]

Continental argues that even if *Garcia* is not applicable to appellants' claim, this Court's decision in *Mazzanti v. Merck Co.*, 770 F.2d 34 (3d Cir.1985) (per curiam) mandates application of a two-year statute of limitations. We find Continental's reasoning flawed and unpersuasive. *Mazzanti* involved a common law diversity action for tortious interference with an employment contract. As is typical in tortious interference cases, the plaintiff in *Mazzanti* had filed a complaint against Merck & Company, a third party, alleging tortious interference with her employment contract with PHP Graphic Arts Corporation, which resulted in her termination by Graphic.[22] *Id.* In considering whether to apply Pennsylvania's two-year statute of limitations or its residual six-year statute to Mazzanti's claim, this Court, relying principally on a Pennsylvania Court of Common Pleas decision, *Home for Crippled Children v. Erie Insurance Exchange*, 130 P.L.J. 480 (Allegheny Cty., 1982), *aff'd mem.*, 329 Pa.Super. 610, 478 A.2d 84 (1984), predicted that the Supreme Court of Pennsylvania would apply the two-year statute. *See Mazzanti*, 770 F.2d at 36. *Home for Crippled Children*, in turn, based its judgment primarily on its determination that the plain language of 42 Pa.Cons.Stat.Ann. § 5524(3) (Purdon 1982) which prescribes a two-year limitation period for "taking, detaining or injuring personal property," encompassed tortious interference, since contract rights—even if· intangible—are personal property under Pennsylvania law.

In the course of examining appellant's claim, the *Mazzanti* Court made reference to our prior decisions in *Knoll I* and *Fitzgerald*, which applied Pennsylvania's six-year limitations period to plaintiffs' claims of employment discrimination. Noting the effect of *Wilson v. Garcia, supra*, on those decisions, the *Mazzanti* Court summarily noted "that *Garcia, Knoll [I]* and *Fitzgerald* all confronted the state limitations problem in the context of federal actions with unique federal policy concerns," and concluded that "those cases [are not] controlling in a diversity context." 770 F.2d at 36. Contrary to Continental's contention, we see nothing in *Mazzanti* to suggest that *all* federal actions for discrimination are now subject to a two-year statute of limitations under Pennsylvania law. *Mazzanti* considered our prior decisions inapposite and therefore inapplicable to its facts not because of the substantive analysis employed to resolve the Pennsylvania limitations issue, but rather because of the unique federal context in which the analyses were made.[23] Thus, *Mazzanti* simply does not mandate a two-year limitations period for appellants' claims.

Appellants note that "most of the cases discussed and relied upon by both parties

---

**21.** This court's decision in *Goodman v. Lukens Steel Co.*, 777 F.2d 113 (3d Cir.1985), *cert. granted*, — U.S. —, 107 S.Ct. 568, 93 L.Ed.2d 573 (1986), highlights the limitation of *Garcia*. In *Goodman* we held that § 1981 actions alleging employment discrimination must, like § 1983 actions making the same type of claim, apply the same period of limitations, *viz*, the two-year personal injury statute. In other words, *Goodman*, like *Garcia*, focused not on the nature of the particular claim, but rather on the historical basis unifying all § 1981 actions. 777 F.2d at 119–20. Moreover, noting the "substantial overlap" in claims brought under §§ 1981 and 1983, the *Goodman* Court concluded that, given the Supreme Court's decision in *Garcia*, application of different limitations periods "where the same claim is brought under § 1981 would lead to a bizarre result." *Id.* at 120.

**22.** A tortious interference with contract claim may only lie against a third party. *See Wells v. Thomas*, 569 F.Supp. 426, 435 (E.D.Pa.1983)

("Pennsylvania law does not permit a terminated employee to assert against his or her employer a claim for intentional interference with his [or her] employment relationship; it is not a claim which can be made by the parties to a 'contract' against each other.").

**23.** The *Mazzanti* court recognized that the implementation of the federal policy concerns that were at issue in *Knoll I* and *Fitzgerald* "has now been resolved by the United States Supreme Court [in *Garcia* ] on a premise different from that which we employed in [those cases.]" 770 F.2d at 36. That premise, rejected in *Garcia, see* 471 U.S. at 273–75, 105 S.Ct. at 1946–47, was to treat "the particular [§ 1983] claim in suit on an ad hoc basis, focusing on 'the relief sought and the type of injury alleged.'" *Fitzgerald*, 741 F.2d at 35 (quoting *Aitchison v. Raffiani*, 708 F.2d 96, 101 (3d Cir.1983)).

on the merits are employment discrimination cases under Title VII." Second Brief for Appellants Cross-Appellees at 41. In the course of various rulings, the district court repeatedly likened appellants' claims to an action alleging employment discrimination.[24] The gravamen of appellants' complaint, to paraphrase the district court, is that they were singled out for adverse treatment on the basis of their unvested pension eligibility. We do not deem the district court's determination to be in error. Accordingly, we find that the six-year limitation period was properly applied in this case.

### 2.

In *DelCostello v. International Bhd. of Teamsters*, 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983), the Supreme Court considered what statute of limitations should apply to suits alleging that the employer breached a provision of a collective bargaining agreement and that the union breached its duty of fair representation by mishandling the ensuing grievance or arbitration proceedings. The Court concluded that the six-month limitations period of

§ 10(b) of the National Labor Relations Act, 29 U.S.C. § 160(b) (1982), should govern the suit.[25] In choosing § 10(b), the Court noted:

> In some circumstances ... state statutes of limitations can be unsatisfactory vehicles for the enforcement of federal law. In those instances, it may be inappropriate to conclude that Congress would choose to adopt state rules at odds with the purpose or operation of federal substantive law.

462 U.S. at 161, 103 S.Ct. at 2289. Rather, resort to federal law may be appropriate "when a rule from elsewhere in federal law clearly provides a closer analogy than available state statutes, and when the federal policies at stake and the practicalities of litigation make that rule a significantly more appropriate vehicle for interstitial lawmaking...." *Id.* at 172, 103 S.Ct. at 2294.

Three factors were essential to the *DelCostello* Court's determination that the six-month limitations period of § 10(b) of the NLRA should apply to a hybrid § 301/fair representation claim.[26] First, the Court noted that the hybrid § 301/fair representation claim "ha[d] no close analogy in ordi-

---

**24.** Indeed, the characterization of the nature of appellants' claim is a key element underlying most of the issues in the instant cross-appeal.

**25.** In the proceedings before the district court, Continental moved for dismissal urging application of the *DelCostello* six-month limitation period. The district court denied the motion, noting that because the *DelCostello* limitation "applied [only] to actions filed after binding arbitration, it is wholly inapplicable to this case." Jt.App. at 171. Our review of the case law in this Circuit, however, reveals no such limitation. *See, e.g., Martin v. Pullman Standard*, 726 F.2d 101 (3d Cir.1984) (holding that *DelCostello* was applicable but remanding for determination whether statute of limitations was tolled until plaintiff was informed by union that his grievance had been withdrawn); *Scott v. Local 863, Int'l Bhd. of Teamsters*, 725 F.2d 226 (3d Cir. 1984) (applying *DelCostello* where union refused to proceed to arbitration); *Perez v. Dana Corp.*, 718 F.2d 581 (3d Cir.1983) (applying *DelCostello* to claim that union breached its duty of fair representation by failing to carry his grievance to arbitration).

Indeed, in holding that the six-month limitations period of § 10(b), as opposed to state limitations periods for vacating an arbitration

award, was applicable to DelCostello's claims, the Supreme Court observed that

> [a]pplication of an arbitration statute seems straightforward enough when a grievance has run its full course, culminating in a formal award by a neutral arbitrator. But the union's breach of duty may consist of a wrongful failure to pursue a grievance to arbitration ... or a refusal to pursue it through even preliminary stages.

462 U.S. at 166 n. 16. Thus, application of the six-month limitations period to situations in which no binding arbitration had occurred was specifically contemplated by the Court. *DelCostello* is nonetheless inapplicable to the instant action. See discussion *infra*.

**26.** Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 (1982), authorizes actions "for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce." 29 U.S.C. § 185(a). The Supreme Court's decisions in *Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), and *Hines v. Anchor Motor Freight*, 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976), gave recognition to a joint cause of action against the employer for breach of contract and the union for breach of duty of fair representation under section 301.

nary state law," 462 U.S. at 165, 103 S.Ct. at 2291, but rather bore a "family resemblance" to charges of unfair labor practice under the NLRB. *Id.* at 170, 103 S.Ct. at 2293. Second, the Court considered the "rapid final resolution of labor disputes," *id.* at 168, 103 S.Ct. at 2292, essential to the maintenance of industrial peace. Finally, the Court recognized " '[t]he need for uniformity' " where " 'those consensual processes that federal labor law is chiefly designed to promote—the formation of the . . . agreement and the private settlement of disputes under it [—are implicated].' " *DelCostello*, 462 U.S. at 171, 103 S.Ct. at 2294 (quoting *United Parcel Serv. v. Mitchell*, 451 U.S. 56, 70, 101 S.Ct. 1559, 1567, 67 L.Ed.2d 732 (1981) (Stewart, J., concurring in judgment)).

■ We do not think the policy considerations that animated the Court's adoption of the six-month limitations period in *DelCostello* are present here. Unlike *DelCostello*, we have held *supra* that the district court's determination that appellants' claims most closely resemble an employment discrimination claim was not in error. In another context, yet on facts similar to those in the instant appeal, Judge Sarokin noted the similarity between § 510 ERISA actions and employment discrimination claims under Title VII:

> Just as Title VII does not guarantee employment, section 510 of ERISA does not guarantee pension benefits; similarly, as Title VII prohibits discrimination on the basis of race with respect to such employment, so does section 510 prohibit discrimination with respect to pension benefits on the basis of one's proximity to such benefits.

*McLendon v. Continental Group, Inc.*, 602 F.Supp. 1492, 1503–04 (D.N.J.1985).[27] We think the analogy is appropriate.

Moreover, the *DelCostello* Court emphasized that "federal courts should [not] eschew use of state limitations periods anytime state law fails to provide a *perfect*

analogy." 462 U.S. at 171, 103 S.Ct. at 2294 (emphasis added). The Court recognized that "there is not always an obvious state-law choice for application to a given federal cause of action." *Id.* Nevertheless, the Court concluded that "resort to state law remains the norm for borrowing of limitations periods." *Id.* Thus, only if "a rule from elsewhere in federal law *clearly* provides a closer analogy," *id.* at 172, 103 S.Ct. at 2294 (emphasis added), may we "turn away from state law." *Id.*

Continental suggests that § 10(b) of NLRA provides such an analogy. Examination of the remaining two factors considered by the *DelCostello* Court, however, counsels otherwise. There can be no doubt that the "rapid final resolution of labor disputes [is] favored by federal law." 462 U.S. at 168, 103 S.Ct. at 2292. This Court has recently observed, however, that such speed and finality are most relevant where the disputed issue "is intertwined with the day-to-day relationship between management and labor." *Adams v. Gould Inc.*, 739 F.2d 858, 867 (3d Cir.1984), *cert. denied*, 469 U.S. 1122, 105 S.Ct. 806, 83 L.Ed.2d 799 (1985). *Adams* involved an ERISA breach of fiduciary duty claim against trustees of a pension plan. There, we found that the day-to-day working environment was unaffected where the dispute involved pension contributions, and thus the implication of delay in resolving such disputes did not justify application of the shorter limitations period. Similarly, in the instant action, the nature of appellants' claims, albeit serious, is not such that a delay in resolution threatens labor peace. Indeed, although appellants' claims are markedly different from the claim alleged in *Adams, see infra*, involving as they do pension plans and eligibility, here, as in *Adams*, "it [is] far more likely that employees will not be aware of their grievance immediately." *Id.* at 867.

Finally, *DelCostello's* concern with uniformity was informed both by the "similarity of the rights asserted" and the "similari-

---

**27.** The *McLendon* plaintiffs assert claims virtually identical to appellants' claims in the instant action. Namely, they challenge both the Continental Group's 'capping program' and its failure

to recall laid off employees as an effort to abort their eligibility for Rule of 65 and 70/75 pension benefits as violative of § 510 of ERISA. *See McLendon,* 602 F.Supp. at 1497.

ty of the considerations relevant to the choice of a limitations period." *DelCostello*, 462 U.S. at 170–71, 103 S.Ct. at 2294. Continental argues, based on the language of § 8(a)(3) of the NLRA, 29 U.S.C. § 158(a)(3),[28] that appellants' ERISA claims bear a "family resemblance" to unfair labor practice claims alleging discrimination on the basis of union membership. Continental has provided this Court with no case law to assist in determining whether there exists a similarity in the rights asserted in § 8(a)(3) NLRB actions and § 510 ERISA actions. Assuming *arguendo*, however, that such similarity exists, we would nevertheless hold *DelCostello's* six-month limitations period inapplicable to this action because satisfaction of the second prong of the uniformity concern—similarity in the policy considerations relevant to the choice of a limitations period—is lacking.

In that regard, *DelCostello* held application of § 10(b) appropriate on its facts, finding that both hybrid § 301/fair representation actions and unfair labor practice claims must be considered in light of " 'the proper balance between the national interests in stable bargaining relationships and finality of private settlements, and an employee's interest in setting aside what he views as an unjust settlement under the collective bargaining system.' " *Id.* at 171, 103 S.Ct. at 2294 (quoting *Mitchell*, 451 U.S. at 71, 101 S.Ct. at 1568 (Stewart, J., concurring in judgment)). As we noted above, the instant dispute, unlike that contemplated in *DelCostello*, does not threaten to destabilize the bargaining relationship in the manner contemplated by *DelCostello* because here the day-to-day relationship between labor and management is not affected. *See supra.* Moreover, and more important, the desirability of a uniform national limitations period exists where the claims asserted arise under a collective bargaining agreement. Under these circumstances, uniformity operates to preserve " 'the grievance machinery under a collec-

tive bargaining agreement [that] is at the very heart of the system of industrial self-government.' " 462 U.S. at 168, 103 S.Ct. at 2293 (quoting *Mitchell*, 451 U.S. at 63, 101 S.Ct. at 1564).

In the instant action, Section 7.1(a) of the Pension Agreement between the USW and Continental provides:

> If, during the term of this Agreement, any differences shall arise between the Company and any Employee who shall be an applicant for a lump sum retirement allowance, pension or deferred benefit as provided in this Agreement, as to whether or not such Employee is entitled to or as to the amount of such lump sum retirement allowance, pension or deferred benefit, such differences ... may be taken up as a grievance ...

Jt.App. at 1930. In ruling on Continental's motion to dismiss for failure to exhaust grievance procedures, the district court had occasion to consider the nature of appellants' claim and whether that claim was covered under the Pension Agreement. The court stated: "[W]e do not believe that the plaintiffs' claim falls within the terms of the [Pension Agreement] ... since they are ... neither applicants for a pension nor in dispute with the defendant as to whether or not they are entitled to a pension. The plaintiffs' claim is not that they have been denied their pensions, but that they have been denied the opportunity to eventually become entitled to a pension." Jt.App. at 165. We agree with the district court's characterization of appellants' claims and its conclusion that such claims are not encompassed under the terms of the Pension Agreement. *Cf. Amaro v. Continental Can Co.*, 724 F.2d 747, 749 (9th Cir.1984) ("This statutory claim [under § 510 of ERISA] is not for benefits under a collective bargaining agreement. The employees, in fact, are not yet eligible for those benefits.") Thus, appellants' § 510 discrimination claim does not implicate the concerns that persuaded the *DelCostello*

---

**28.** Section 8(a)(3) provides:

(a) It shall be an unfair labor practice for an employer—

(3) by discrimination in regard to hire or tenure of employment or any term or condi-

tion of employment to encourage or discourage membership in any labor organization. 29 U.S.C. § 158(a)(3) (1982).

Court to apply § 10(b) to hybrid § 301/fair representation claims.

In sum, *DelCostello* does not mandate application of the six-month limitation period of § 10(b) of the NLRB in this case where (1) an adequate state analogy exists and affords a limitations period that does not frustrate national policy, (2) the policies underlying adoption of the six-month limitations period are not present, and (3) no alternative federal limitations period has been suggested to this Court. Accordingly, *DelCostello* is inapplicable and Pennsylvania law governs.

### B. Exhaustion of Remedies

■ Subsequent to oral argument in this case, another panel of this Court held that "an employee with a claim under Section 510 of ERISA need not submit that claim to the plan before seeking relief in a federal district court." *Zipf v. American Telephone and Telegraph Co.* ("AT & T"), 799 F.2d 889, 893 (3d Cir.1986). *Zipf* clearly controls the resolution of Continental's exhaustion claim.

In *Zipf*, appellant suffered from rheumatoid arthritis which caused her to take a disability leave of absence from her employment. After Zipf returned to full-time status, she continued occasionally to miss work due to her illness. Eventually, her condition worsened and she began another period of disability leave. On the seventh day of absence Zipf was informed by her supervisor of the company's decision to terminate her because of her " 'excessive absenteeism.' " *Zipf*, 799 F.2d at 890. Zipf filed suit alleging that the decision to terminate was made in violation of § 510 of ERISA to prevent her from potentially qualifying for substantial benefits for which she would have become eligible on her eighth day of absence from work. Summary judgment was entered for AT & T and Zipf's suit was dismissed for failure to exhaust internal administrative remedies.

Upon review, this Court identified two distinct exhaustion issues: (1) whether before seeking judicial relief on a § 510 claim, a claimant is required to submit that claim to the plan and (2) "whether [a § 510 claimant], before seeking judicial relief ..., must submit to the plan the question of whether [s/he] would have been eligible for benefits had [s/he] not been discharged." 799 F.2d at 891. Proceeding to examine the law of this Circuit, the *Zipf* Court found our prior decision in *Wolf v. National Shopmen*, 728 F.2d 182 (3d Cir.1984), inapplicable to actions "brought not to enforce the terms of a plan, but to assert rights granted by the federal statute." *Zipf*, 799 F.2d at 891. This Court then rejected the argument, also advanced in the instant appeal, *see* Reply Brief of Cross-Appellant at 21–24,[29] that ERISA contains an implied exhaustion requirement even as to substantive rights conferred under the statute. Examining the legislative history of the Act, we concluded that "the remedy for Section 510 discrimination was intended to be provided by the courts." *Zipf*, 799 F.2d at 892. Finally, *Zipf* recognized the strong national policy favoring arbitration and the traditional practice of the courts to defer to administrative expertise. Relying on this Court's decision in *Barrowclough v. Kidder, Peabody & Co., Inc.*, 752 F.2d 923 (3d Cir.1985), the *Zipf* Court concluded that these considerations supported the balance struck in *Barrowclough*, to wit:

the most reasonable accommodation is to hold that claims to establish or enforce rights to benefits under 29 U.S.C. § 1132(a) that are independent of claims based on violations of the substantive provisions of ERISA are subject to arbitration, ... while claims of statutory violations can be brought in a federal court

---

**29.** Indeed, Continental's argument goes further. Continental maintains that "ERISA *requires* that there be internal review procedures to handle claims under the pension plan." Reply Brief of Cross-Appellant at 21 (emphasis in original). Continental fails to distinguish between contractual rights protected under the Act and substantive rights conferred by the Act. *See DelGrosso v. Spang & Co.*, 769 F.2d 928 (3d Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 2246, 90 L.Ed.2d 692 (1986) (interpreting *Barrowclough v. Kidder, Peabody & Co., Inc.*, 752 F.2d 923 (3d Cir. 1985)).

notwithstanding an agreement to arbitrate.

*Zipf,* 799 F.2d at 892 (quoting *Barrowclough* ) (citations omitted).

Standing alone, *Zipf* ineluctably leads to the conclusion that appellants' were not required to exhaust arbitral remedies. Continental argues, however, that *Zipf* must be read in light of our prior decision in *Jacobson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 797 F.2d 1197 (3d Cir. 1986). Indeed, Continental contends that "attempted application of the principles articulated in *Zipf*," would put this Court at odds with recent Supreme Court precedent and create a direct conflict with *Jacobson.* Letter of Eugene L. Stewart, Attorney for Continental Can at 3 (Sept. 10, 1986). Rather than apply *Zipf,* Continental urges that "[t]he correct approach to the exhaustion issue has been articulated by the ... Supreme Court in *Mitsubishi* [*Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985),*] and followed by this court in *Jacobson.*" *Id.* at 5. Continental's argument does not alter the result.[30]

In *Mitsubishi,* the Supreme Court rejected the claim that an "arbitration clause must specifically mention the statute giving rise to the claims that a party to the clause seeks to arbitrate." 105 S.Ct. at 3353. Thus, no presumption against arbitrability arises when the right involved is statutory as opposed to contractual. The proper approach in considering issues of arbitrability, the Court instructed, is twofold: First, the court must determine whether the parties' agreement to arbitrate encompasses the statutory issues, and second, if so, "whether legal constraints external to the parties' agreement foreclose[ ] the arbitration of those claims." *Id.* at 3355.

In *Zipf* the approach approved in *Mitsubishi* was not contravened. The *Zipf* Court did not resort to a presumption of unarbitrability, but rather sought to ascertain Congressional intent on the question of the arbitrability of substantive discrimination claims under § 510 of ERISA. Its examination of the legislative intent of § 510 revealed an express desire that claims brought thereunder be submitted to the courts. "Indeed, an amendment that would have created an administrative remedy for Section 510 claims, to be established by the Department of Labor, was defeated." *Zipf,* 799 F.2d at 892. *Jacobson,* which held that determining arbitrability of federal statutory claims is, after *Mitsubishi,* "a matter of statutory interpretation" and may not be determined "on the basis of some judicially recognized public policy," *Jacobson,* 797 F.2d at 1202, is thus fully consistent with the reasoning and holding in *Zipf.*

## IV.

### THE APPEAL

■ We now proceed to the merits of appellants' claims. Our standard of review of issues involving the interpretation and application of legal precepts is plenary. *United States v. Adams,* 759 F.2d 1099, 1106 (3d Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 275, 336, 88 L.Ed.2d 236 (1985). The trial court's findings of fact are governed by the clearly erroneous standard of review, *Anderson v. City of Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985), "but as to the legal component of its conclusion, this court has plenary review." *United States v. Felton,* 753 F.2d 276, 278 (3d Cir.1985).

---

**30.** Continental points to Judge Adams's separate opinion in *Jacobson* for the proposition that *Zipf*'s reliance on *Barrowclough,* in light of *Mitsubishi,* cannot be sustained. *See* Letter of Eugene Stewart at 2–4 (Sept. 10, 1986). In *Jacobson,* Judge Adams stated: *"Mitsubishi* spurned the basis proffered for this Court's decision in *Barrowclough,* stating that 'we find no warrant in the Arbitration Act for implying in every contract within its ken a presumption against arbitration of statutory claims.'" *Jacobson,* 797 F.2d at 1209 (Adams, J. concurring in part, dissenting in part) (citations omitted). The issue of *Barrowclough* 's continued vitality, of course, is not before this Court. *Mitsubishi* 's rejection of a rule of nonarbitrability of statutory claims, however, does not undercut the independent interpretation of Section 510 in *Zipf.*

Appellants' contentions may be summarized as follows: (1) the district court erred in its conclusion that a classwide violation of ERISA had not been established; (2) the district court erred in requiring appellants to prove during the liability proceedings that their layoffs were caused by Continental's liability avoidance program, and by depriving appellants of a rebuttable presumption on causation; (3) assuming *arguendo* that causation was properly at issue during the liability phase and that the burden of proof on that issue lay with appellants, they carried their burden by establishing that Continental's critical decisions were motivated both by permissible and impermissible factors, and the district court erred thereafter in placing the additional burden on the appellants to prove that, "but for" Continental's consideration of impermissible factors, they would have retained their jobs; and (4) finally, appellants independently argue that the critical factual findings of the district court were clearly erroneous.

These claims require us to consider complex questions concerning both the elements of proof of a § 510 ERISA discrimination claim and the allocation of the burdens of proof on trial of such claim. Any analysis of these issues must begin with an understanding of the nature of the claims asserted by the appellant class and the purposes of the statute under which these claims are brought.

## A.

■ Section 510 of ERISA prohibits employer conduct taken against an employee who participates in a pension benefit plan for "the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan." 29 U.S.C. § 1140 (1982). Congress enacted § 510 primarily to prevent "unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights." [31] *West v. Butler*, 621 F.2d 240, 245 (6th Cir.1980); *see also Zipf v. American Telephone & Telegraph Co.*, 799 F.2d at 889, 891 (1986) (citing *Butler*); *Donahue v. Custom Management Corp.*, 634 F.Supp. 1190, 1197 (W.D.Pa.1986) (quoting *Butler*). To recover under § 510, a plaintiff need not prove that "the *sole* reason for his [or her] termination was to interfere with pension rights." *Titsch v. Reliance Group, Inc.*, 548 F.Supp. 983, 985 (S.D.N.Y.1982), *aff'd*, 742 F.2d 1441 (2d Cir.1983) (emphasis in original). A plaintiff must, however, demonstrate that the defendant had the "'specific intent' to violate ERISA." *Watkinson v. Great Atlantic & Pacific Tea Co., Inc.*, 585 F.Supp. 879, 883 (E.D.Pa.1984) (quoting *Titsch, supra*). Proof of incidental loss of benefits as a result of a termination will not constitute a violation of § 510. *See Titsch*, 548 F.Supp. at 985 ("No ERISA cause of action [under § 510] lies where the loss of ... benefits [i]s a mere consequence of, but not a motivating factor behind, a termination of employment.").

■ Under the prevailing case law, and in accordance with the statutory language, the essential element of proof under § 510 is specific intent to engage in proscribed activity. Proof of specific intent to

---

**31.** Section 510 represents but one provision designed to ensure pension security for the working class. Referring to the overall goals of the ERISA legislation, Senator Javits noted:

Mr. President, a pension-reform law is now a reality because of the hardship, deprivation and inequity suffered by American working people. It is their collective anger and disgust that put tremendous congressional majorities behind [this legislation], and if we who espoused their cause in this body have sometimes not behaved in as gentlemanly a manner as is customary—and I hope those aberrations of conduct have been rare—it is because we too shared their sense of indignation and frustration over what often seemed to be a cynical disregard of fundamental American concepts of fairness and decency by some of those who managed the private pension funds.

The agony of years of frustrated and disappointed beneficiaries has now come to an end. The discipline of law will enable this and succeeding generations of workers to face their retirement period with greater confidence and greater security....

3 *Legislative History of the Employee Retirement Income and Security Act of 1974,* at 4751 (1976) (remarks of Senator Javits).

interfere with the attainment of pension eligibility, then, "regardless of whether the interference is successful and regardless of whether the participant would actually have received the benefits absent the interference," *Zipf,* 799 F.2d at 893, will ordinarily constitute a violation of § 510 of ERISA.[32] In most cases, however, specific intent to discriminate will not be demonstrated by "smoking gun" evidence. As a result, the evidentiary burden in discrimination cases may also be satisfied by the introduction of circumstantial evidence. *See Maxfield v. Sinclair Int'l,* 766 F.2d 788, 791 (3d Cir.1985) *cert. denied,* — U.S. —, 106 S.Ct. 796, 88 L.Ed.2d 773 (1986) (age discrimination). In the latter circumstance courts have developed "formula[s] ... that enable[ ] the trial judge to sift through the evidence in an orderly fashion to determine the ultimate question in the case—did the defendant intentionally discriminate against the plaintiff[s]." *Dillon v. Coles,* 746 F.2d 998, 1003 (3d Cir.1984).

**B.**

As in the context of employment discrimination claims under Title VII, employees alleging discrimination under ERISA bear the burden of making out a *prima facie* case of discrimination. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36

L.Ed.2d 668 (1973); *see also Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253–54, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981) (refining *McDonnell Douglas* ). To establish a *prima facie* case under ERISA § 510, an employee must demonstrate (1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employee may become entitled. 29 U.S.C. § 1140 (1982). In a class action context, it is not enough for the class representative to prove the validity only of his or her own claim. *See General Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 158, 102 S.Ct. 2364, 2371, 72 L.Ed.2d 740 (1982). Rather, the class representative "must establish that discrimination was the employer's standard practice." *Dillon,* 746 F.2d at 1004; *see also Cooper v. Federal Reserve Bank of Richmond,* 467 U.S. 867, 876, 104 S.Ct. 2794, 2800, 81 L.Ed.2d 718 (1984) (class representative must establish that 'discrimination was the company's standard operating procedure') (quoting *International Bhd. of Teamsters v. United States,* 431 U.S. 324, 336, 97 S.Ct. 1843, 1855, 52 L.Ed.2d 396 (1977)), the burden of persuasion on the ultimate issue of intentional discrimination "remains at all times with the plaintiff." *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093.[33]

---

32. *Zipf*'s construction of § 510 is supported by the legislative history which envisions preventive, as well as corrective, purposes of the provision. *See* S.Rep. No. 127, 93d Cong., 1st Sess. 35 (1973), *reprinted in 1 Legislative History of the Employee Retirement Income and Security Act of 1974,* at 621 (1976) ("The enforcement provisions have been designed specifically to provide ... participants and beneficiaries with broad remedies for redressing or preventing violations [of ERISA] "); *id.* at 622 ("the committee has concluded that safeguards are required to preclude this type of abuse from being carried out"); *see also 3 Legislative History of the Employee Retirement Income and Security Act of 1974,* at 4745 (1976) ("a further protection for employees is the prohibition against discharge, or other discriminatory conduct toward participants and beneficiaries which is designed to interfere with attainment of vested benefits") (Senate floor debate on conference report on H.R. 2). Continental does not contest this construction; rather it maintains that "the district court's holding is in accordance with *Zipf*." Letter of James D. Morton at 2 (Sept. 11, 1986).

33. At least two circuits have held that the *Burdine* allocation of proof by which the ultimate burden of persuasion remains at all times with the plaintiff is inapplicable in a class action context. *See Taylor v. Teletype Corp.,* 648 F.2d 1129, 1137 n. 18 (8th Cir.), *cert. denied,* 454 U.S. 969, 102 S.Ct. 515, 70 L.Ed.2d 386 (1981) (*Burdine* does not affect a case of classwide discrimination where the evidence exposes the employer as "a proven wrongdoer" and creates a presumption—"unless the employer proves otherwise—that any class member was a victim of that policy"); *Vuyanich v. Republic Nat'l Bank,* 521 F.Supp. 656, 661 (N.D.Tex.1981) ("*Burdine* is limited by the factual context in which it was decided.") *vacated on other grounds,* 723 F.2d 1195 (5th Cir.1984); *cf. Johnson v. Uncle Ben's,* 657 F.2d 750 (5th Cir.1981); *cert. denied,* 459 U.S. 967, 103 S.Ct. 293, 74 L.Ed.2d 277 (1982) (*Burdine* allocation of proof inapplicable in Title VII disparate impact cases). In each of these cases, the plaintiffs had raised challenges to employment practices based on their discriminatory impact. In deciding that *Burdine,* which

If the class establishes a *prima facie* case by a preponderance of the evidence, the burden of production shifts to the employer to introduce admissible evidence of a legitimate, nondiscriminatory reason for its challenged actions. *See Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094; *International Bhd. of Teamsters v. United States,* 431 U.S. 324, 360 & n. 46, 97 S.Ct. 1843, 1867 n. 46, 52 L.Ed.2d 396 (1977); *Dillon,* 746 F.2d at 1004. If the employer fails to rebut the presumption of discrimination that arises from the class's *prima facie* case, the district court must enter judgment for the class. *See Teamsters,* 431 U.S. at 361, 97 S.Ct. at 1867. If, however, the employer carries its burden of production, the presumption drops from the case and the class representative is afforded the opportunity to demonstrate that the employer's articulated reason is pretextual "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095; *Bellissimo v. Westinghouse Elec. Corp.,* 764 F.2d 175, 179–80 (3d Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1244, 89 L.Ed.2d 353 (1986); *Dillon,* 746 F.2d at 1003–04; *see also Ursic v. Bethlehem Mines,* 556 F.Supp. 571 (W.D.Pa.), *aff'd in part,* 719 F.2d 670 (3d Cir.1983) (employing a *Burdine*-like analysis to an ERISA § 510 claim).

Where the plaintiffs' case does consist of *direct* "smoking gun" evidence that the employer acted with discriminatory motivation, however, the Supreme Court has indicated that the *McDonnell Douglas-Burdine* shifting burdens mechanism is inapplicable. *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121, 105 S.Ct. 613, 623, 83 L.Ed.2d 523 (1985); *see also Goodman v. Lukens Steel Co.,* 777 F.2d 113, 130 (3d Cir.1985) ("The presumptions and shift-

ing burdens are merely an aid—not ends in themselves. When direct evidence is available, problems of proof are no different than in other civil cases.") (citing *Trans World Airlines, supra; United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983); *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978)), *cert. granted,* —— U.S. ——, 107 S.Ct. 568, 93 L.Ed.2d 573 (1986); *Dillon,* 746 F.2d at 1005 ("Once the plaintiff establishes liability the sine qua non for the [*McDonnell Douglas*] formula no longer exists."); *Bell v. Birmingham Linen Serv.,* 715 F.2d 1552, 1556 (11th Cir.1983), *cert. denied,* 467 U.S. 1204, 104 S.Ct. 2385, 81 L.Ed.2d 344 (1984) ("*McDonnell Douglas* ... pertains primarily ... to situations where direct evidence of discrimination is lacking"); *cf. Los Angeles Dept. of Water & Power v. Manhart,* 435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978) (policy requiring larger contribution to pension fund from women than from men was discriminatory on its face); *EEOC v. Wyoming Retirement System,* 771 F.2d 1425, 1430 (10th Cir.1985) (direct evidence of discrimination codified in retirement statute). Guided by these general principles, we turn to appellants' class claims of discrimination under ERISA.

### C.

In the proceedings before the district court, "[p]laintiffs ... assert[ed] that ... [Continental] deliberately followed a plan for avoiding pension liability as a means of increasing its profits, not that it deliberately increased plant profitability by a means that happened to effect [sic] employees' eligibility for pension benefits." Jt.App. 170. The appellants thus raised a cognizable claim under § 510 which requires that loss of benefits be more than a "mere consequence" of employer conduct. *Titsh,* 548 F.Supp. at 985. Appellants maintained

---

was an individual disparate treatment case, did not apply to the claims before them, those courts found significant the absence of an intent requirement in impact cases. The instant action is distinguishable in that proof of specific intent to discriminate is required. Moreover,

this Court, in a nonclass action context, has rejected the intent/impact distinction as requiring different burdens. *See NAACP v. Medical Center, Inc.,* 657 F.2d 1322, 1333–34 (3d Cir. 1981).

that Continental, in accordance with the alleged discriminatory plan, improperly (1) "capped" the Pittsburgh plant, (2) closed the pail line and (3) laid off members of the employee class, all in violation of § 510 of ERISA. *See* Jt.App. at 31–36. The district court found that the liability avoidance plan was designed to "avoid triggering future vesting." FF 53. Moreover, the court found that all three actions allegedly taken pursuant to that plan were motivated in part by Continental's desire to prevent appellants from attaining pension eligibility. Nevertheless, the court concluded that none of the challenged actions established a classwide violation of § 510 and, accordingly, entered judgment for Continental. *See* CL 4–5.

Appellants argue that both the evidence adduced at trial and the findings of the district court establish that Continental violated § 510 by engaging in the challenged conduct for the purpose of interfering with appellants' attainment of pension eligibility for 70/75 and Rule of 65 benefits. Each of the acts that appellants claim was undertaken for proscribed purposes may independently make out a claim of discrimination under § 510. We shall first consider the liability avoidance program. Because the question whether the individually challenged actions of Continental—the layoffs, the capping of the Pittsburgh plant, and the closure of the pail line—constitute violations of the ERISA present similar procedural issues, those claims will be considered together in a separate section, *infra.*

1. *Liability Avoidance Program*

Appellants first maintain that the overall adoption and implementation of the "Bell System" in itself establishes a classwide violation of § 510 of ERISA. Although the

district court made extensive findings of fact with regard to the elements of and the intent underlying the liability avoidance plan, it did not reach a conclusion as to whether these findings constituted a·violation of ERISA. Our review of appellants' claim requires us to consider the proof requirements under the Act and to determine whether the evidence adduced at trial satisfies the elements of a § 510 claim.

The central features of Continental's Bell System, as established by the district court's findings, are as follows: (1) to identify Continental's "unfunded pension liabilities," i.e. employees who have not yet attained the required age and service to qualify for 70/75 and Rule of 65 benefits, *see* FF 53, 64; (2) to designate those employees as "permanently laid off," ineligible for recall absent exigent circumstances, and then only with prior approval of top Continental management, *see* FF 54–57; (3) to alert Continental management through a computerized "red flag" system whenever an employee designated as "permanently laid off" receives a pay check, FF 69–70; and (4) to adjust the level of production to a predetermined level of employment. *See* FF 61, 63. In addition, the district court found that "Continental often referred to the goals outlined in the Bell System as 'liability avoidance.' It had two aspects: (a) sheltering or keeping employed 70/75 qualified employees so that their employment was assured throughout their normal careers; and (b) preventing further employees from qualifying for 70/75 pensions." *See* FF 68.

◼ At the outset, Continental disputes that the liability avoidance plan was implemented at the Pittsburgh plant, and it argues that adoption of the plan, without more, cannot support a finding of liability.[34] *See* Brief of Appellee-Cross Appel-

---

**34.** Continental also argues that the question whether the liability avoidance plan in itself violated ERISA was not before the district court. *See* Brief of Appellee-Cross Appellant at 15. The evidence proves otherwise. First, in Count III of the *Jakub* complaint, appellants maintained at item 38 that "the Company secretly devised and implemented a 'liability avoidance' or 'cap program'. The goal of this pro-

gram was to prevent employees at the West Mifflin plant from attaining eligibility for these break-in-service pensions by capping the work force." Jt.App. at 34. Item 45 of Count III asserted that "[b]y the conduct alleged above, the Company has discharged, suspended and discriminated against plaintiffs for the purpose of interfering with employees' attainment of rights under the Company's benefit plans, all in

lant at 14. We reject both claims. First, Continental's contention that its liability avoidance plan was not implemented at Pittsburgh disregards the evidence and the findings of the district court. The district court found that such a plan—the Bell System—was indeed created by Continental, *see* FF 51–54, 68, that Pittsburgh was selected as one of the three 'concept development plants' for the implementation of the plan, *see* FF 62; Jt.App. at 1385, and that Continental was motivated in part by the stated objectives of the liability avoidance

violation of Section 510 of ERISA, 29 U.S.C. 1140." *Id.* at 36. We think it is clear that appellants challenged the overall liability avoidance program and its requirement that non-vested employees be designated as permanently laid off as discriminatory conduct.

The district court, however, repeatedly thwarted these attempts to challenge the system as a whole, requiring instead proof of an act that *actually* interfered with appellants' eligibility as opposed to one taken for the purpose to do so.

During an exchange between the district court and counsel, appellants attempted to explain the gravamen of their complaint.

APPELLANTS: "[I]t is the defendants' action in laying them off, in selecting them for layoff and laying them off that is the subject of this claim.

. . . . .

We are not attempting to prove in this case,—Although it might very well be an independent violation, the Court will not be called upon to [decide] in this case that a failure to call back in some discriminatory fashion constitutes a violation of ERISA, although it well may. But that's not what this case is about. *This case is about the selection and designation for layoff of people.* Now as part and parcel of that proof, we have shown the Court and put in testimony that on April 1st, 1977, a red flag system was initiated; that although this system was put into place back then, it became finalized and was allowed to go into place ... once they got their plant-wide seniority in the fall of '77....

*The point was that they put the designation on these people, permanent layoff, red flag was instituted to keep that permanent layoff, designation in place....*"

THE COURT: "I don't think it matters whether it is permanent or not. Either if they laid people off permanent or not permanent with the purpose being to prevent them from attaining their pension rights or whatever, it would be a violation of ERISA."

Jt.App. at 468–70 (emphasis added). Although the response of the district court is not an inaccurate statement of a cognizable claim under section 510, it implicitly fails to recognize the particular claim asserted by appellants that the

plan in making each of the challenged decisions that resulted in the layoffs of individual class members. *See* FF 106, 141.[35] Second, as to the claim that adoption alone is insufficient conduct to constitute a violation of ERISA, both Continental and the district court misperceive the breadth of § 510.[36] The following colloquy illustrates the point:

APPELLANTS: "[T]he definition of the class says clearly people who were designated for layoff; and *the fact that*

implementation of the plan was itself a violation of ERISA.

**35.** An internal memorandum of Continental dated July 11, 1977 further indicates that the system was in effect at the Pittsburgh facility. The memorandum included "the explanatory report of the bridge from Bell I to Bell II," and sought to "ensure the implementation and continued use of Bell II." Jt.App. at 1073.

**36.** Both Continental and the district court misconstrued the nature of the act or conduct requirement of section 510 in a class action context. Continental maintains that "[t]o discriminate, there must be some act. The existence of an alleged plan, without more, does not affect a participant." Brief of Appellee-Cross Appellant at 14. Similarly, in response to appellants' contention that "The discriminat[ory act] is putting them in a class that precludes their working," the district court stated: "And I am telling you as a matter of law classifying doesn't do anything to them." Jt.App. at 624–25. In the district court's view, "[s]chemes are only relevant in a conspiracy. We are not involved with a conspiracy here. It doesn't matter what [Continental's] scheme was. It's what they did. It doesn't matter what they planned; it's what they did that counts." Jt.App. at 903.

In a class action context, however, the "scheme" or policy is exactly what is at issue. *See Cooper v. Federal Reserve Bank of Richmond,* 467 U.S. 867, 875–76, 104 S.Ct. 2794, 2799–2800, 81 L.Ed.2d 718 (1984); *International Bhd. of Teamsters v. United States,* 431 U.S. 324, 335, 97 S.Ct. 1843, 1854, 52 L.Ed.2d 396 (1977); *Franks v. Bowman Transp. Co.,* 424 U.S. 747, 772, 96 S.Ct. 1251, 1267, 47 L.Ed.2d 444 (1976); *see also General Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 157–59, 102 S.Ct. 2364, 2370–71, 72 L.Ed.2d 740 (1982) (a classwide challenge must encompass more than one allegation of discriminatory treatment). Appellants did not seek to prove the mere existence of an abstract, dormant plan or policy. Rather, they sought to demonstrate that specific acts had been taken to implement the allegedly discriminatory plan and that the plan was actually in effect.

*they were designated for layoff then doesn't mean they had to be laid off and then—"*

THE COURT: "Yes, but *the act of designation doesn't deprive them of any ERISA rights.*"

APPELLANTS: "No, Your Honor. It does not."

THE COURT: "And the only—"

APPELLANTS: *"Well, it does discriminate against them.* I think labeling them—"

THE COURT: "But this is not a discrimination case. *This is an ERISA case, and no rights have been taken away from them until they are laid off; and so the designation really has no significance as far as a violation of ERIDA is concerned.*"

Jt.App. at 473–74 (emphasis added).

 Section 510, however, unlike other anti-discrimination provisions, is designed to *prevent* injury to employees' protected rights, not simply to redress the injury after the goals of a discriminatory plan have been effectuated. *See Zipf,* 799 F.2d at 891. To be certain, the broad, remedial objectives of § 510 do not authorize sanctions merely for an employer's state of mind. There must be some act in furtherance of an employer's desire to interfere with an employee's rights to pension benefits. That act, however, need not achieve the employer's illicit goals. To keep the effects of discriminatory intent "in the air", so to speak, is part of § 510's *raison d'etre.* The statute prohibits specified conduct "for the purpose of interfering with the attainment of any right...." 29 U.S.C. § 1140 (1982). Thus, actual deprivation is not a prerequisite to class liability under § 510, *ergo* the challenged act need not have caused actual deprivation or have actually interfered with the attainment of pension eligibility.

Because the district court construed § 510 as requiring actual deprivation of rights, it failed to consider properly the inchoate components of the liability avoidance scheme that, though producing no immediate or tangible effects on appellants'

rights, nevertheless constituted deliberate steps undertaken for the purpose of interfering with appellants' attainment of pension eligibility. When so understood, it is clear that the district court's own findings are evincive of appellants' satisfaction of their burden to establish by a preponderance of the evidence that the plan was infested with discriminatory intent sufficient to constitute a violation of ERISA. Indeed, if Continental's liability avoidance scheme does not constitute direct proof of discrimination under § 510, we are hard pressed to imagine a set of facts that would.

In *Lee v. Russell County Bd. of Educ.,* 684 F.2d 769 (11th Cir.1982), the Eleventh Circuit observed:

Where the evidence for a prima facie case consists, as it does here, of direct testimony that defendants acted with a discriminatory motivation, if the trier of fact believes the prima facie evidence the ultimate issue of discrimination is proved; no inference is required. Defendant cannot rebut this type of showing of discrimination simply by articulating or producing evidence of legitimate, nondiscriminatory reasons.

*Id.* at 774. We think that this standard applies with equal force to this case where appellants presented direct documentary proof of Continental's intent to discriminate against non-vested employees in the adoption and implementation of its liability avoidance plan. *See also Bell v. Birmingham Linen Serv.,* 715 F.2d 1552, 1556–57 (11th Cir.1983), *cert. denied,* 467 U.S. 1204, 104 S.Ct. 2385, 81 L.Ed.2d 344 (1984) ("It would be illogical, indeed ironic, to hold a ... plaintiff presenting direct evidence of a defendant's intent to discriminate to a more stringent burden of proof, or to allow a defendant to meet that direct proof by merely articulating, but not proving, legitimate, nondiscriminatory reasons for its actions.").

 Moreover, the district court's findings of fact indicate that it credited appellants' case on the ultimate issue of discrimi-

nation.[37] The district court found that "Bell was aimed at managing Continental's unfunded pension liabilities, by enabling it to describe its unfunded pension liabilities and *to avoid triggering future vesting,* while securing the employment of those employees whose benefits had already vested." *See* FF 53 (emphasis added).[38] We read the court's finding as establishing that Continental devised its liability avoidance scheme for the sole purpose of preventing employees from attaining eligibility for the break-in-service pensions.[39]

■ In sum, appellants contend, and we agree, that the maintenance of the program with the specific intent to interfere with class members' pension eligibility was in itself a classwide violation of ERISA entitling them to injunctive relief. *See International Bhd. of Teamsters v. United States,* 431 U.S. 324, 360–61, 97 S.Ct. 1843, 1867, 52 L.Ed.2d 396 (1977) (proof of a discriminatory policy may justify injunctive relief); *cf. Cooper v. Federal Reserve Bank of Richmond,* 467 U.S. at 876, 104 S.Ct. at 2800 (proof of pattern and practice of discrimination entitles class to prospective relief).[40] In light of the uncontested findings of the district court that establish the requisite discriminatory intent of the liability avoidance plan, *see* FF 53, 68, and in the absence of any rebuttal evidence from Continental that the plan was not so designed—wholly apart from the determination whether individual class members were actually laid off in accordance with the plan—appellants were entitled to an injunction on their claim that the liability avoidance plan, as implemented, violated § 510 of ERISA. *See Dillon,* 746 F.2d at 1004.

**37.** Indeed, Continental did not and does not here dispute the discriminatory motive of the liability avoidance plan. In its answer to the count of appellants' amended complaint that charged that the plan had been conceived with the proscribed intent, *see* Jt.App. at 34 (Count III, item 38), Continental did not offer an alternative purpose for the plan but rather entered a general denial. *See* Jt.App. at 44. Continental did attempt to characterize the permanent lay off classification as a mere bookkeeping entry. *See* Brief of Appellee-Cross Appellant at 13. The district court's findings, however, do not support such a characterization. Overall, Continental primarily directed its proof at trial and its arguments before this Court to the affirmative acts of the company alleged by appellants to have been taken pursuant to the discriminatory liability avoidance plan. Those arguments, which will be considered *infra,* do not undercut the allegation that the plan itself was imbued with discriminatory intent and constituted a violation of ERISA.

**38.** Continental's internal memoranda described the plan as follows:

The Bell System ... enable[s us] to describe our unfunded pension liabilities and develop a strategic approach to avoiding future exposures while at the same time securing the employment of those employees in which the vast majority of the unfunded liability is vested.... In a capped situation, our manning latitude is limited to a specific point on the seniority roster. Beyond that point no recall can take place as recall will reinstate the employee's continuous service thereby preventing future liability avoidance.... In short, we need to identify, analyze and implement [specified] changes to our manning practices and our business selection and servicing which allow the maximum realization of profit in our capped locations.
Jt.App. at 1074–75.

**39.** That the avoidance of pension liability was Continental's *sole* purpose in instituting the liability avoidance program cannot be gainsaid. Nor can it be seriously contended that the liability avoidance scheme was legitimately designed to save the company from economic ruin.

Section 510 proscribes exactly this type of conduct. In enacting this provision, Congress recognized that it may sometimes be in the employer's economic self-interest to abort its employees' accumulation of the requisite age and service prior to vesting. Congress sought to provide safeguards for such abuses and to ensure that "an employer cannot fire anybody with impunity to avoid pension liability." 2 *Legislative History of the Employee Retirement Income Security Act of 1974,* at 1811 (1976) (remarks of Senator Javits). Thus, section 510's essential purpose is to prevent employers from intentionally interfering with impending pension eligibility whether motivated by malice toward the particular employee(s) or by a general concern for the economic stability of the company. Of course, as we noted *supra,* incidental loss of pension benefits as the result of a legitimate business practice will not constitute a violation of ERISA. Bad faith, however, is not an element of a section 510 claim.

**40.** In the instant appeal, the subsequent shutdown of the Pittsburgh plant renders injunctive relief unnecessary. That appellants adduced sufficient proof entitling them to such relief, however, is unaffected by the closure of the plant.

## 2. *The Layoffs, the Cap and the Closure of the Pail Line*

Appellants' remaining claims charge that Continental took specific actions, pursuant to its intentionally discriminatory liability avoidance scheme that resulted in their loss of employment. As to these claims, appellants assert that in light of the unrebutted evidence that Continental's liability avoidance program was adopted and implemented with discriminatory animus toward non-vested employees, they should have been accorded a presumption that each class member's job loss as a result of those actions was caused by the discriminatory policy. In this regard, appellants argue that the district court erred "in resolving the question whether the liability avoidance program *caused* the class members' loss of work in the liability trial, and imposing the burden on plaintiffs to prove that causation, when that question should have been remitted to the remedy trial with the plaintiffs enjoying a rebuttable presumption that their lost work was caused by the unlawful program and with the burden of proof on Continental to prove otherwise." Brief for Appellants at 22–23 (emphasis in original). In any event, appellants continue, "having found that the loss of work was the consequence of mixed motives, [the district court erred] in not imposing the burden on Continental to prove that the loss of work would have occurred in the absence of ("but for") the illegal motivation." *Id.* at 23.

At the conclusion of the "liability" trial the district court found that a motivating factor in Continental's decisions to close the pail line, to cap the Pittsburgh plant and lay off individual and class plaintiffs was to prevent employees from attaining eligibility for 70/75 and Rule of 65 benefits. *See* FF 106, 141. The court also found that Continental was also motivated by legitimate business considerations. *See* FF 107, 142. Continental does not dispute the findings of impermissible motivation; rather, it relies on the findings of the district court that hold that the results of the challenged actions would have occurred in any event, *see* FF 107, 142, as precluding liability.

Our consideration centers around whether the various burdens of proof in a class action where both permissible and impermissible factors are involved were appropriately allocated. In essence, appellants' contention is that in a class action context, the determination whether injury to individual class members was caused by a proved discriminatory policy is properly assigned to the "remedy" phase of the trial with the burden of proving that the injury was not so caused resting with the defendant. Although we agree with appellants' ultimate contention that in this case the "but for" burden of proof was misapplied, we shall take this opportunity to clarify various procedural misconceptions implicit in their argument. In order to assess properly the various elements of appellants' claim, then, it is appropriate to categorize those elements and to treat them separately.

### a. Causation

Appellants point to three Supreme Court decisions for the proposition that "questions whether individual job loss was *caused* by [a proved] violation ... are to be addressed in the remedial phase of the litigation." Brief of Appellant at 33. In *Franks v. Bowman Transp. Co., supra,* a class action challenging the seniority and hiring practices of Bowman Transportation was resolved favorably for the plaintiffs. Certain seniority relief, however, was denied and plaintiffs appealed. Upon review, the Supreme Court held that the district court had improperly withheld seniority relief from unnamed members of the class on the basis that there was no evidence presented during the liability proceedings regarding vacancies, qualifications and performance for each member of the class. *Franks,* 424 U.S. at 772, 96 S.Ct. at 1267. The Court rejected the implication that such evidence was a prerequisite to class-wide relief and further explained that where "petitioners ... have carried their burden of demonstrating the existence of a discriminatory ... pattern and practice by the respondents ... the burden will be upon respondents to prove that individuals

... were not in fact victims of ... discrimination." *Id.*

*International Bhd. of Teamsters v. United States, supra,* echoed and elaborated upon the *Franks* methodology. In *Teamsters* the Supreme Court considered charges that both the employer and the union had engaged in a pattern and practice of discriminatory conduct. The Court again recognized two distinct stages in class action proceedings and articulated the requisite proof to be adduced at each stage. At the initial 'liability' stage, proof that the discriminatory policy actually existed is all that is required. *See* 431 U.S. at 360, 97 S.Ct. at 1867. "[T]he question of individual relief does not arise until [the 'remedial' stage, after] it has been proved that the employer has followed an employment policy of unlawful discrimination." *Id.* at 361, 97 S.Ct. at 1868.

Finally, in *Cooper v. Federal Reserve Bank of Richmond, supra,* the Supreme Court again gave recognition to the two-stage methodology. The Court noted that in a class context "[w]hile a finding of a pattern or practice of discrimination itself justifies an award of prospective relief to the class, additional proceedings are ordinarily required to determine the scope of individual relief for the members of the class." *Cooper,* 467 U.S. at 876, 104 S.Ct. at 2800.

In the instant appeal, the proceedings before the district court concluded after the "liability" stage of the litigation with judgment entered for the defendants. Appellants maintain that on the basis of *Franks, Teamsters* and *Cooper* the liability phase of this litigation actually ended upon their showing that Continental's liability avoidance program constituted a classwide violation of § 510 and that all questions of causation should have been remitted to the remedial phase of the litigation with the "but for" burden of proof resting with Continental. Appellants' argument is flawed in two respects.

First, this Court recently questioned the utility of approaching the burdens issue according to the label affixed to the particular stage of the litigation. Rather, in *Dillon v. Coles, supra,* we determined that the more helpful approach is to "review the proof requirements in each instance." 746 F.2d at 1004. Thus, determining whether the burden of proving causation is properly allocated depends not so much on the particular stage of the proceedings as on the actual evidentiary proofs in the record at the time of the allocation.

■ The Supreme Court's decision in *Burdine* makes clear that the plaintiff bears the burden of persuasion by a preponderance of the evidence to establish a case of discrimination. *See Burdine,* 439 U.S. at 252–53, 101 S.Ct. at 1093. The Court's decisions in *Franks, Teamsters* and *Cooper* require no less: The class representative bears the initial burden to make out the prima facie case, *see Teamsters,* 431 U.S. at 360, 97 S.Ct. at 1867 (interpreting *Franks*), and must "ultimately ... prove ... that ... discrimination was the company's standard operating procedure— the regular rather than the unusual practice." *Id.* at 336, 97 S.Ct. at 1855 (emphasis added); *see also Cooper,* 467 U.S. at 876, 104 S.Ct. at 2800 (same). Where the ultimate factual determination is still at issue, the "but for" burden of proof is properly assigned to the *plaintiff* and may operate to discharge the plaintiff's burden of persuasion and entitle him or her to relief.

In the instant appeal, the district court erroneously construed this "but for" burden as requiring appellants to prove that "but for" Continental's consideration of their impending pension eligibility, appellants would have *remained* at work; instead, that burden only requires proof that "but for" the impermissible consideration, appellants' would not have *lost* work. The distinction is significant. As this Court explained in *Bellissimo v. Westinghouse Elec. Corp.,* 764 F.2d 175 (3d Cir.1985), *cert. denied,* — U.S. ——, 106 S.Ct. 1244, 89 L.Ed.2d 353 (1986):

The "but for" test does not require a plaintiff to prove that the discriminatory reason was the determinative factor, but only that it was a determinative factor. Interpreting Title VII to require proof of

"the determinative factor" is inconsistent with the "but for" causation test, insofar as plaintiff would be required to show that the discriminatory motive was the *sole* reason for the action taken. More than one "but for" cause can contribute to an employment decision, and if any one of those determinative factors is discriminatory, Title VII has been violated.

*Id.* at 179 n. 1 (citations omitted).

 Similarly, § 510 of ERISA requires no more than proof that the desire to defeat pension eligibility is "a determinative factor" in the challenged conduct. From our review of the record, it is manifest that the district court considered the appellants' burden of proof on causation to be significantly heavier than that required by our precedent. *See, e.g. Bellissimo,* 764 F.2d at 179 n. 1 (but for causation requires proof that "the discriminatory reason was ... *a* determinative factor") (emphasis in original); *Lewis v. University of Pittsburgh,* 725 F.2d 910, 915–16 (3d Cir.1983), *cert. denied,* 469 U.S. 892, 105 S.Ct. 266, 83 L.Ed.2d 202 (1984) (but for causation requires more than proof that discriminatory reason was 'a substantial' or 'a motivating factor' in challenged decision); *Smithers v. Bailar,* 629 F.2d 892, 898 (3d Cir.1980) (plaintiff need only prove that the discriminatory reason "made a difference" in the challenged decision). *Accord Dillon, supra; Duffy v. Wheeling Pittsburgh Steel Corp.,* 738 F.2d 1393 (3d Cir.), *cert. denied,* 469 U.S. 1087, 105 S.Ct. 592, 83 L.Ed.2d 702 (1984). The district court repeatedly indicated that appellants' must prove not only that their impending pension eligibility made a difference in Continental's deci-

sions that resulted in their layoffs, but also that those decisions and, consequently, their layoffs would not have occurred for any other reason.[41] *See* Jt.App. at 480, 628–33, 637–39, 676–77.

Under this Court's formulation of the "but for" test of causation, appellants' properly challenged the district court's application of a markedly different standard of proof. We stress, however, that our determination that the district court erred in its application of the "but for" causation test is based upon the particular test applied, not on the propriety of requiring proof of causation as a prerequisite to a finding of liability. As to the latter issue, we think it clear that "but for" causation, properly construed, is an element of plaintiff's ultimate burden of persuasion. Appellants' broader contention, that their demonstration of a classwide violation in the adoption and implementation of the liability avoidance plan relieved them of the burden of proving that their job loss due to the cap of the Pittsburgh plant and the closure of the pail line was a result of the plan, however, requires further analysis. In this regard, it is necessary to determine the scope of the presumption ·that arises from proof of the discriminatory policy.

### b. Presumption Of Individual Discrimination

 There can be little doubt that upon proof of an intentionally discriminatory plan or policy, a presumption that they were actual victims of the discriminatory policy inures to the benefit of the individual

---

**41.** The district court stated:

> [T]he courts have said that the tests that you apply are, you say, "Was [Continental's] desire to limit liability under ERISA ... a determinative factor in the action that they took," but the courts have also said that the test you apply is "but for." In other words, but for their desire to limit liability, would this action have been taken? In other words, if the action would have been taken anyhow ... for other reasons, [appellants] lose, ... even though their desire to limit their liability was a determinative factor.

Jt.App. at 480. The district court's statement misrepresents the law on at least two levels.

First, as became clear in subsequent colloquies, the court considered the burden of proving that the action would not have been taken for other reasons as resting with the appellants. As stated by appellants and supported by the case law, however, their "burden [is] to show [that the discriminatory reason] ... made a difference. [They did] not have the burden to rule out all other causes." Jt.App. at 676. Second, in the district court's view, success on the merits required more than proof that discriminatory motivation was a determinative factor in challenged conduct. *See* discussion, *infra.*

class members.[42] *See Franks*, 424 U.S. at 772, 96 S.Ct. at 1267. In *Teamsters*, the Supreme Court stated that "[t]he proof of the pattern or practice supports an inference that any particular employment decision, during the period in which the discriminatory policy was in force, was made in pursuit of that policy." 431 U.S. at 362, 97 S.Ct. at 1868. Here, appellants urge that they were deprived of the *Teamsters-Franks* rebuttable presumption that each individual class member's job loss occurring during the period in which the liability avoidance program was in effect was caused by that discriminatory program. Before addressing appellant's contention we think it necessary to clarify the nature and scope of the *Teamsters-Franks* presumption.

■■■ The presumption that arises upon proof of a discriminatory policy attaches to all employer actions that may reasonably be considered as within the ambit of that policy. In other words, the *Teamsters-Franks* presumption presupposes a vertical nexus between the proved discriminatory policy and the employer conduct for which individual relief is sought. Thus, proof that an employer's standard operating procedure with respect to its hiring policies is intentionally discriminatory may not necessarily support a class member's individual challenge of the employer's promotion practices. *Cf. General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) (individual's challenge of employer's promotion practices did not necessarily render him an adequate representative for class challenging hiring practices). Similarly, the determination that an employer engages in classwide

discrimination on one level is not tantamount to a conclusion that it does so on all levels. Thus, while proof of a discriminatory policy in one area of employment practice may be probative of the employer's intent in another area, it will not necessarily establish a presumption that the second area is similarly infested with the illegal intent.

At trial of this action, Continental specifically maintained that each of its challenged employment decisions were taken for legitimate purposes and not pursuant to the liability avoidance program.[43] Under these circumstances, Continental would have the *Burdine* burden shifting mechanisms apply at the threshold to each challenged act with the initial burden of persuasion on the plaintiff to prove a *prima facie* case by a preponderance of the evidence that each act was a result of discriminatory intent. Continental suggests that to require otherwise would be to fasten liability onto Continental for "discrimination in the air." Brief for Appellee-Cross Appellant at 27 (paraphrasing *Dillon*, 746 F.2d at 1004). Continental misreads both our opinion in *Dillon* and the Supreme Court's decisions in *Franks* and *Teamsters*.

In *Dillon* this Court noted that in a class action context "the liability phase of the case is not concluded until [the individual class member] ... demonstrates his own basis for an award." 746 F.2d at 1004. The court continued:

It is misleading to speak of the additional proof required by an individual class member for relief as being part of the damage phase; that evidence is actually an element of the liability portion of

---

**42.** "The force of that proof does not dissipate at the remedial stage of the trial. The employer cannot, therefore, claim that there is no reason to believe that its individual employment decisions were discriminatorily based; it has already been shown to have maintained a policy of discriminatory decisionmaking." *Teamsters*, 431 U.S. at 361–62, 97 S.Ct. at 1868. Put otherwise, in a class action setting, once the class representative has met the burden of persuasion on the ultimate issue in the case—whether the employer intentionally discriminated against the class—each individual member of the class is presumptively entitled to relief.

**43.** Indeed, as we noted *supra*, Continental contends that the liability avoidance program was never implemented at the Pittsburgh plant. That we have rejected this contention does not deprive Continental of its defense of legitimate purposes as to the individually challenged decisions. On the facts of this case, however, whether Continental bears a burden of persuasion or production as to its legitimate purpose defense depends on the specific act for which the defense is offered. *See infra*.

the case. Until the individual has demonstrated actual injury to himself, the court may not direct individual relief. Just as in the tort field, where "negligence in the air" is not enough to fasten liability on a defendant, so in a Title VII case discrimination in general does not entitle an individual to specific relief.

Id.[44]

Continental maintains that it "met its burden of proving that no one in Pittsburgh was affected by any alleged discriminatory policy.... [and t]hus, any presumption as to each Plaintiff and each class member disappeared and there was no basis for any remedy for anyone." Brief of Appellee-Cross Appellant at 26. Continental moves too far too fast.[45] While the "discrimination in the air" concept is relevant to an individual's entitlement to relief, it does not affect the presumption that arises upon proof of a discriminatory policy. Indeed, as recognized by this Court in Dillon, "[i]n a class action setting, an individual member may build on the discrimination established by the class." 746 F.2d at 1004. Thus, before reaching the question of individual entitlement, the preliminary issue concerns the nature and scope of the presumption arising from appellants' proof of a discriminatory policy.

In the instant appeal, Continental attempts to capitalize on the independent nature of appellants' § 510 claims. Because each challenged act may itself constitute a classwide violation of ERISA, Continental essentially argues that each claim must satisfy the Burdine burden shifting mechanism. Appellants would therefore bear the initial burden to prove by a preponderance of the evidence that Continental engaged in each act with the illegal intent to discriminate. Continental could then meet appellants' prima facie case by articulating a nondiscriminatory reason for its actions which raises a genuine issue of fact as to whether it discriminated. The effect of this approach, however, is to discount appellants' direct documentary proof of the discriminatory liability avoidance program, and consequently, to reduce Continental's burden on rebuttal. Such an approach is contrary to Franks and Teamsters.

Having established that Continental adopted and implemented a program premised on impermissible considerations and designed to achieve a discriminatory result, appellants were entitled to "an inference that any particular employment decision, during the period in which the discriminatory policy was in force, was made in pursuit of that policy." Teamsters, 431 U.S. at 362, 97 S.Ct. at 1868. We hold that the scope of the presumption arising from the discriminatory liability avoidance plan extends to those discrete acts which, as found by the district court, were specifically contemplated to implement the plan—namely, the designation of class members as permanently laid off, see FF 57, the institution of the red flag system see FF 69–70; and the capping of the Pittsburgh plant, see FF 54.

---

**44.** Appellants suggest that our decision in Dillon is inconsistent with Franks, Teamsters and Cooper. We do not read Dillon as presenting such a conflict. First, Dillon primarily emphasized that the designation of a proceeding as liability or remedy should not be determinative of the proof required of the litigants in a discrimination suit. At any rate, we do not think the substantive discussion in Dillon is at odds with Supreme Court precedent. The additional proof to which Dillon refers consists of the demonstration that "vacancies or opportunities for employment or advancement existed." 746 F.2d at 1004. In the context of ERISA, after the class has established that it is entitled to an injunction, an individual class claimant need only show that s/he was eligible for break-in-service pensions, was available for work, designated as permanently laid off and laid off prior to vesting. As to why s/he was laid off, as noted in Teamsters, "the employer [i]s in the best position to show why any individual employee was denied an employment opportunity." 431 U.S. at 359 n. 45, 97 S.Ct. at 1867 n. 46.

**45.** The defect in Continental's position stems from its erroneous assumption that the Teamsters-Franks rebuttable presumption "is no different than the rebuttable presumption existing after a plaintiff presents a prima facie case." Brief of Appellee-Cross Appellant at 24. To the contrary, the presumptions arising from each situation are quite distinct. As to the latter presumption, defendant's burden on rebuttal is merely one of production; as to the Teamsters-Franks presumption, however, the defendant's burden is one of persuasion. See discussion infra.

We are satisfied that as to these particular acts the vertical nexus contemplated by *Franks* and *Teamsters* inheres in the various components of the plan. While we recognize that the plan also specifically contemplated shifting business volume so as to avoid incurring additional pension liability, *see* FF 63, we are not convinced that the closure of pail line alone establishes the requisite nexus with the plan. Thus, the presumption arising from appellants' proof of the discriminatory liability avoidance program does not automatically extend to Continental's decision to close the pail line. That the presumption does not so extend, however, does not alter the ultimate outcome of this appeal.

3. The *Teamsters-Franks* Presumption and the "But For" Burden in Mixed Motive Cases.

In *Franks, Teamsters,* and *Cooper, supra,* the Supreme Court acknowledged the propriety of shifting the burden of persuasion onto the defendant if it sought to avoid liability after proof of a discriminatory policy had been adduced. Thus, if after sifting through the evidence, a district court determines that the defendant has failed to introduce admissible or credible evidence sufficient to rebut the plaintiff's case, then, in accordance with *Franks, Teamsters* and *Cooper,* the "but for" burden of persuasion rests properly with the defendant. This "but for" burden requires proof from the defendant that it would have reached the same decision or engaged in the same conduct in any event, i.e., in the absence of the impermissible consideration, and operates to limit the scope of the relief available to individual class members. This Court has recognized that "placing the burden on the employer 'to demonstrate that the individual [class] applicant was denied an employment opportunity for lawful reasons,' is entirely consistent with the *Burdine* allocation of burdens in a suit brought by an individual plaintiff." *Dillon,* 746 F.2d at 1004 (quoting *Teamsters* ) (citation omitted). This is so because at this stage the ultimate burden of persuading the court that the employer intentionally discriminated against the class has been car-ried. Thus, "[n]o reason appears ... why the victim rather than the perpetrator of the illegal act should bear the [but for] burden of proof...." *Franks,* 424 U.S. at 773 n. 32, 96 S.Ct. at 1268 n. 32. In sum, placing the "but for" burden of proof on the employer at this juncture honors the presumption that arises upon proof of a discriminatory policy that the individual class members were discriminated against in accordance with that policy, while affording the employer the opportunity to limit its liability upon proof that, as to certain class members, it would have reached the same decisions in the absence of the illegal motivation. *See Mt. Healthy City School District Bd. of Ed. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *cf. East Texas Motor Freight Sys. Inc. v. Rodriguez,* 431 U.S. 395, 403 n. 9, 97 S.Ct. 1891, 1897 n. 9, 52 L.Ed.2d 453 (1977) (citing *Mt. Healthy* in Title VII context); *Bibbs v. Block,* 778 F.2d 1318 (8th Cir.1985) (in banc) (applying *Mt. Healthy* to Title VII action); *Blalock v. Metals Trades, Inc.,* 775 F.2d 703 (6th Cir. 1985) (same).

At the outset, we recognize that this Court has held that proof that an impermissible consideration was a " 'substantial' or 'motivating' factor" in an employer's challenged conduct is insufficient to carry the plaintiff's burden of persuasion on the ultimate issue of discrimination. *Lewis v. University of Pittsburgh,* 725 F.2d 910, 915 (3d Cir.1983), *cert. denied,* 469 U.S. 892, 105 S.Ct. 266, 83 L.Ed.2d 202 (1984). In the instant litigation, although the district court found that the desire to prevent pension eligibility was "a motivating factor" in each of Continental's challenged decisions, we do not read the court's findings and ultimate conclusion that liability was not established in this case as resting on the determination that appellants had failed to prove the requisite degree of motivation, but rather, that appellants had failed to prove that "but for" that motivation they would have remained at work. Thus, we find it unnecessary to review the various versions of the facts urged by the parties before this Court. Nor do we deem

it in the interest of justice to remand for clarification of the district court's findings. Indeed, to construe the district court's findings otherwise would render them clearly erroneous. As the Supreme Court explained in *Anderson v. City of Bessemer City,* 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985), " 'a finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " *Id.* at 573, 105 S.Ct. at 1511 (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948)). From our review of the entire record, we are convinced that the desire to defeat pension eligibility was a "determinative" factor in each of Continental's challenged actions. *Bellissimo,* 764 F.2d at 179 n. 1. A finding to the contrary would be clearly erroneous.

■ We now turn to the final issue in this case: the effect of the *Teamsters-Franks* presumption on the defendant's burden on rebuttal where discriminatory intent is established by proof that both permissible and impermissible factors motivated the challenged conduct. We conclude that whether the class representative discharges his or her burden of persuasion by offering direct proof of discrimination, circumstantial proof of discrimination or proof of mixed motivation, the *Teamsters-Franks* presumption attaches to each individual class member's claim that s/he was a victim of the discriminatory policy.

■ The class met its burden of proving that Continental's liability avoidance plan was discriminatory and the class members were therefore entitled to a presumption that their layoffs, as a result of the capping of the Pittsburgh plant, were in pursuit of that plan. *See* discussion, *supra.* Moreover, the district court's findings establish that appellants independently carried their burden of persuasion that Continental closed the pail line, capped the Pittsburgh plant and laid off individual members of the class for discriminatory purposes. Thus, as to each of the actions challenged by appellants, liability was established. Continental thereafter bore the burden of persuasion to prove by a preponderance of the evidence that it would have made the same decisions in any event.

On the facts of this case, however, the district court required the appellants to bear the burden that properly rests with the defendant. Thus, the district court erred by misallocating the "but for" burden of proof that arises *after* appellants have carried their burden of persuasion on the ultimate issue of discrimination. That the court required appellants to prove that "but for" Continental's decision to abort their pension eligibility they would have remained at work is manifest. We need only recite a few colloquies from the record:

THE COURT: "But if the defendants came in here and admitted that in order to avoid pension liability they laid these people off and they refused to recall them and that their sole reason was to avoid pension liabilities,—"

APPELLANTS: "Yes."

THE COURT: "—but then went on to say, 'But it doesn't make any difference, because we didn't have enough work to keep these people busy anyhow—so they would have been laid off even if that wasn't the case, and they wouldn't have been recalled even though that wasn't the case, because we didn't have any business,'—"

APPELLANTS: "Right."

THE COURT: "—you could not succeed."

APPELLANTS: "Well, unless I persuaded you—First of all, that would be an item of damage. But if they did that, if they sustained their burden, then I agree that I would then have to show you that that was a ruse or not true. They would have the burden of proving that to you if they were able to present such testimony, but that would be an item of damages."

THE COURT: "Yes, but you first have the burden."

APPELLANTS: "That's true. We have the burden of showing by a preponderance—"

THE COURT: "You have the overall burden."

APPELLANTS: "Of showing by a preponderance of the evidence in accordance with the standards that this made a difference."

THE COURT: "And because as to the recalls a directed verdict was issued because you presented no evidence, *it requires you to present in evidence that these people would have been recalled—*"

APPELLANTS: "If the Court—"

THE COURT: "*—except for the fact of their evil intent.*"

Jt.App. at 630–31.

THE COURT: "[J]ust assuming, not that they are admitting, but assuming that [Continental] would admit they didn't want to pay pensions and they would do anything they could to avoid paying pensions, unless you can prove these people would have worked if they didn't have that attitude about pensions, you can't win."

APPELLANTS: "It is true that on damages—I think, Your Honor, that has to do with damages. If they came in and said, 'Yes, we laid them off to avoid pension liability, we discriminated against them, we—' "

THE COURT: " 'But it doesn't make any difference because we didn't need them anyhow.' "

APPELLANTS: "But if they say, 'We violated the statute, we discriminated against them, we laid them off, we discriminated, we called them—that's why we laid them off, to avoid pension eligibility,' then on liability they have violated the statute. As to damages —"

THE COURT: "*I'm saying no, they haven't, unless you show that but for that, [appellants] would have worked.*"

Jt.App. at 632–33. Finally, the court summarized its view of the allocation of the burden of proof in the following passage:

THE COURT: "The problem I am having, Mrs. Litman, very truthfully is, *even if you prove that they did this deliberately with the intent to de-prive these people of their pension rights, unless you are able to show that they would have been called back but for that, you haven't proved your case.*"

Jt.App. at 637 (emphasis added).

We think it clear that the district court required appellants to prove more than that Continental's desire to prevent pension eligibility was a determinative factor in their layoffs. Because we find that the district court misallocated the burden of proof on this issue we do not reach appellants' contentions that the court's factual findings in this regard were clearly erroneous.

## CONCLUSION

In sum, we find that the district court erred in failing to conclude that Continental's liability avoidance plan constituted a classwide violation of ERISA. The district court properly determined that causation was an element of liability and that the burden of proof on that issue lay with the appellants. The district court erred, however, in not recognizing that appellants carried their burden of proof on causation by establishing that Continental's challenged decisions were motivated by both permissible and impermissible factors. Finally, the district court erred in allocating the "but for" burden of proof on appellants as to their challenges to their layoffs, the capping of the Pittsburgh plant and the closure of the pail line, requiring them to prove that "but for" Continental's consideration of impermissible factors they would have retained their jobs.

Accordingly, we will reverse the judgment of the district court and remand for proceedings to determine the appropriate relief. We emphasize our holding that Continental's liability avoidance scheme constituted a violation of ERISA when, pursuant to that scheme, individual class members—whether currently at work or already on layoff status—were designated as permanently laid off for the purpose of defeating their pension eligibility. Upon such designation, each class member was entitled to some relief from the illegal scheme. At what point and in what amount actual damages, if any, began to accrue as to any particular class member,

however, will be a determination to be made in the proceedings upon remand. In those proceedings, individual class members must first establish that they were (1) non-vested employees eligible for 70/75 and Rule of 65 benefits, (2) available for work, (3) labeled as permanently laid off by Continental, and (4) laid off or continued on layoff status prior to attaining eligibility for those benefits. Continental must then be afforded the opportunity to present evidence that as to any particular individual class member's request for relief, that individual is not so entitled because in the absence of Continental's illegal plan that individual would have been without work at the same time in any event. We do not foreclose an opportunity for Continental to submit its proofs collectively as to all of the plaintiffs. That is, if the proof as to each individual is the same, there is no requirement that Continental repeat the same evidence for each claimant. Continental must establish either collectively or individually that class members would have suffered the same loss of work even in the absence of the illegal plan. Continental's burden on this issue will be one of persuasion.