John W. PARKER, Plaintiff,

v.

UNION PLANTERS CORPORATION, Defendant.

No. 01–2070 M1/V.

United States District Court, W.D. Tennessee, Western Division.

May 29, 2003.

Donald A. Donati, Esq., William B. Ryan, Donati Law Firm, LLP, Memphis, TN, for John W. Parker, plaintiff.

Herbert E. Gerson, Esq., Licia Michelle Williams, Ford & Harrison, LLP, Memphis, TN, for Union Planters Corporation, defendant.

## OPINION AND ORDER FOLLOWING NON–JURY TRIAL

McCALLA, District Judge.

The Court held a bench trial in this case from Monday, February 3, 2003 through Wednesday, February 5, 2003. Plaintiff was represented by Donald Donati, Esq. and William Ryan, Esq. Defendant was represented by outside counsel Herbert Gerson, Esq. and Thomas Walsh, Esq., and Jim House, Esq., general counsel for Union Planters Corporation. Plaintiff John Parker, former Chief Financial Officer of Union Planters Corporation ("UPC"), Dr. Thomas Depperschmidt, a forensic economist, and Thomas Vastrick, a forensic document expert, testified on behalf of Plaintiff. Robert Doxey, current Chief Financial Officer and Chief Senior Executive Vice President of UPC, and Jack Moore, Chairman of the Board, President, and Chief Executive Officer of UPC, testified on behalf of Defendant.

In this case, Plaintiff claims that UPC fired him for the purpose of interfering with his attainment of benefits under

UPC's Supplementary Executive Retirement Plan in violation of the Employee Retirement Income Security Act ("ERISA") Section 510, 29 U.S.C. § 1140.[1]

## I. Findings of Fact

Plaintiff John Parker is a highly educated individual who holds an undergraduate degree in accounting and an M.B.A. in finance and who also possesses extensive experience in the field of financial services. (Trial Transcript[2] at 20–31.) Plaintiff was employed by Defendant Union Planters Corporation for a total of twenty-four years. (*Id.*) During his entire tenure with UPC he never had an employment contract. (Tr. at 120.) During the last ten years of his employment, from March 1990 until March 2000, he served as Chief Financial Officer ("CFO") of UPC. (Tr. at 26.) During Plaintiff's tenure as CFO of UPC, the bank grew in size, mainly due to acquisitions, from approximately $4 billion in assets to approximately $33 billion in assets. (Tr. at 27.) UPC also went from being a financial institution that had lost approximately $22 million in the year before Plaintiff became CFO to a financial institution that earned approximately $410 million in the last year he was CFO. (Tr. at 31.)

### A. Mr. Parker's SERP

In 1995, UPC adopted a Supplemental Executive Retirement Plan (the "SERP") for proxy-named officers, including Plaintiff John Parker, Ben Rawlins, Jack Moore, Kirk Walters, and Jim Gurley. (Tr. at 32–33.) The SERP provided for death, disability, and retirement benefits. (Tr. at 34.; Trial Exhibit[3] 1 at § 2.) With respect to retirement benefits, the SERP required Plaintiff to have ten years of service and have attained the age of 55 before he would be eligible for any benefits.[4] (Tr. at 34–35; Tr. Ex. 1 at § 1.9.) According to a report prepared for UPC, the value of Plaintiff's projected SERP benefits on January 1, 1996 was $1,960,177. (Tr. Ex. 2 at 000299.) The value of Plaintiff's projected SERP benefits on January 1, 2000 was $3,380,452. (Tr. Ex. 2 at 000303.)

### B. Organizational Change at UPC

In 1998–1999, discussions began within UPC regarding corporate restructuring and succession planning. (Tr. at 431.) Mr. Rawlins[5] and Mr. Moore were concerned about consolidation in the banking industry—UPC had been involved in approximately seventy-five acquisition transactions across twelve states. (Tr. at 431.) The salary and benefits committee asked Mr. Rawlins and Mr. Moore about the organizational structure, the fact that they had approximately sixty direct reports, which was unwieldy, and the fact that they had no internal successors. (Tr. at 431.) The salary and benefits committee asked them to pursue strengthening the executive management team and to bring in

---

1. On October 12, 2001, Judge Donald dismissed Plaintiff's state law claims, jury demand, and claim for punitive damages. On May 23, 2002, Judge Donald granted summary judgment in favor of Defendant as to Plaintiff's ERISA Section 502 claim.

2. Citations to the Trial Transcript will be referred to hereinafter as "Tr."

3. Citations to exhibits used at trial will be referred to hereinafter as "Tr. Ex."

4. Plaintiff's benefits under the SERP would vest prior to age 55 in the event he was terminated without cause following a change in control of UPC. (Tr. Ex. 1 at § 2.5.) Change in control is not at issue in the present opinion.

5. Ben Rawlins, who served as the Chief Executive Officer of UPC during the time that Plaintiff was employed as the CFO, was unavailable to testify at the trial in this case due to his death on September 12, 2000. (Tr. at 15.)

some executives with large bank experience who had the potential to be a successor to the position of CEO. (Tr. at 431.)

Mr. Rawlins and Mr. Moore brought in a consultant and an executive search firm, which requested that UPC locate a successor CFO. (Tr. at 432.) Mr. Rawlins, in consultation with the salary and benefits committee, decided to demote Plaintiff from the position of CFO. (Tr. at 464–465.) They interviewed three or four people in late 1999 for the position of CFO. (Tr. at 435.)

A headhunter initially contacted Robert Doxey about the possibility of a position at UPC. (Tr. at 330.) Mr. Doxey was not familiar with UPC, so he reviewed the company's financial reports, including the latest 10–Q, on the internet. (Tr. at 337; Tr. Ex. 19.) According to Mr. Doxey, he did not learn from reading the 10–Q that Mr. Parker participated in a SERP. (Tr. at 337.) Mr. Doxey testified that he mostly looked at the balance sheet and income statement to familiarize himself with UPC's financials. (Tr. at 368.) The 10–Q identifies Plaintiff's SERP agreement as an exhibit to the 10–Q. (Tr. Ex. 19 at 02423.) Mr. Doxey testified that he did not print out the exhibits to the 10–Q because he was focused on the balance sheet. (Tr. at 369.)

On December 1, 1999, Mr. Doxey met with Mr. Moore and Mr. Rawlins for the first time. (Tr. at 331.) According to Mr. Doxey, they never discussed his potential compensation or Plaintiff's compensation and benefits. (Tr. at 331.) Mr. Moore invited Mr. Doxey back to Memphis in the first week of January for another meeting. (Tr. at 332.) According to Mr. Doxey, they did not discuss Plaintiff's compensation and benefits at this meeting either. (Tr. at 332.) Mr. Doxey testified that they discussed the role of the CFO at UPC and their desire to bring in someone with experience at a bigger bank because UPC had grown immensely in the 1990's. (Tr. at 333.) In this second meeting, Mr. Doxey also indicated to Mr. Moore and Mr. Rawlins that he wanted to be able to choose the staff that worked for him if he were to be held accountable for them. (Tr. at 333–334.) According to Mr. Doxey, complete authority over his staff was a condition to his acceptance of any offer from UPC. (Tr. at 334.) Mr. Moore confirmed that Mr. Doxey would have absolute authority to select his direct reports and designate their functions. (Tr. at 438.)

After this second meeting, Mr. Moore called Mr. Doxey to offer him the position of Senior Executive Vice President and Chief Financial Officer. (Tr. at 335.) Mr. Doxey called him back to accept the offer a few days later. (Tr. at 335–336.) During this conversation, they discussed Mr. Doxey's compensation. (Tr. at 339.) According to Mr. Doxey, they did not discuss Plaintiff's benefits or the SERP in this conversation. (Tr. at 336.) Although Mr. Doxey possessed UPC's 10–Q while he was negotiating his salary with UPC, he testified that they never discussed Mr. Parker's SERP at any point prior to his accepting a position with UPC. (Tr. at 336, 369.) Mr. Moore confirmed that he and Mr. Rawlins never revealed Plaintiff's participation in the SERP to Mr. Doxey or discussed Plaintiff's SERP in any of their meetings. (Tr. at 435.) Mr. Doxey also read UPC's April 15, 1999 Proxy Statement to determine executive base compensation and bonuses. (Tr. at 370–372; Tr. Ex. 15 at 00846.) He testified that he did not read the entire document and never looked at the sections regarding options, grants, restricted stock, employment contracts, or executive benefit plans. (Tr. at 372–373.)

## C.  Mr. Parker's demotion

In February of 2000, Mr. Rawlins, who was then Chief Executive Officer of UPC,

met with Plaintiff. Mr. Rawlins informed Plaintiff that he and Mr. Moore wanted to redo the organization chart to eliminate some of their direct reports. (Tr. at 37–38.) As part of this internal reorganization, Mr. Rawlins informed Plaintiff that they would be hiring Mr. Doxey, a Certified Public Accountant, as the new CFO to take over some of Plaintiff's duties and that Plaintiff would report to Mr. Doxey. (Tr. at 38.) According to Plaintiff, Mr. Rawlins told Plaintiff that most of his job functions would remain the same, but they were hiring Mr. Doxey because "we've got to get the cost saves, we have got to upgrade our accounting systems ... we're going to improve our budgeting system, we're going to improve our forecasting of earnings system and all those kind of things." (Tr. at 38–39.) With respect to his demotion, Plaintiff testified, "I didn't really have any problem with it because we had grown from ... four billion to thirty-three billion and we were now a big bank and we had a lot of issues.... So I didn't have a lot of problems with it." (Tr. at 41–42.) Plaintiff also testified that "it seemed like a logical business decision to me." (Tr. at 42.)

During this meeting with Mr. Rawlins, Plaintiff brought up the subject of an employment agreement and his SERP benefits. (Tr. at 40–41.) According to Plaintiff, Mr. Rawlins said "we can't take your SERP away.... I'll talk to Jack [Moore], see what we need to do." (Tr. at 41.)

After this conversation with Mr. Rawlins, Plaintiff went to see Mr. Moore to discuss the possibility of an employment agreement and his SERP benefits. (Tr. at 44.) Mr. Moore told Plaintiff he would look into it. (*Id.*)

Around this time, Mr. Doxey was introduced to the senior executives of UPC. (Tr. at 43–44.) Afterwards, in early February, he came to see Plaintiff.[6] (Tr. at 150.) Mr. Doxey told Plaintiff that he would be looking at UPC's accounting systems and Plaintiff would be responsible for funds management. (Tr. at 45.) During their conversation, Mr. Doxey also informed Plaintiff that one of the conditions under which he had accepted the job with UPC was that Mr. Doxey would have the authority to determine those employees he would keep and those he would not keep. (Tr. at 45, 343.) Plaintiff testified that at that point he believed he was history and that Mr. Doxey was the "hit man". (Tr. at 45.) Plaintiff did not mention the SERP during this meeting. (Tr. at 344.)

After his conversation with Mr. Doxey, Plaintiff went back to Mr. Moore and again expressed concerns about his SERP benefits, which had not vested because he was not yet 55, and asked about the possibility of an employment contract. (Tr. at 45.) Plaintiff testified that he told Mr. Moore he had "real concerns after my meeting with Bobby that he could arbitrarily terminate me and bring in one of his cronies." (*Id.; see also* Tr. at 151–152.) During cross-examination, Plaintiff also testified, "I didn't have any concerns at the time that Mr. Moore and Mr. Rawlins were going to terminate me." (Tr. at 152.) During this meeting, Mr. Moore told Plaintiff he would look into the SERP and the possibility of an employment contract. (Tr. at 47.) Mr. Moore later sent Plaintiff a note dated February 11, 2000 regarding the SERP. (Tr. at 49–51; Tr. Ex. 3.) In this note, Mr. Moore confirmed that Plaintiff was not entitled to SERP benefits until he reached age 55, but that Mr. Moore and

---

**6.** According to Mr. Doxey, this meeting did not occur until March 1, 2000 when he began work at UPC. (Tr. at 342.) The date of the meeting is not material to the Court's decision, but given the time line it appears that the meeting probably did occur in February of 2000, as Mr. Parker testified.

Mr. Rawlins would bring up the possibility of an employment agreement with the salary and benefits committee. (Tr. at 50; Tr. Ex. 3.) In the note, Mr. Moore also informed Plaintiff that it would not be appropriate to ask the salary and benefits committee to amend the SERP at that time to provide for immediate vesting upon involuntary termination because he had just been demoted. (Tr. at 469; Tr. Ex. 3.)

After the salary and benefits committee meeting, Plaintiff again spoke with Mr. Moore, who informed Plaintiff that he had forgotten to raise the issue of Plaintiff's benefits at the meeting. (Tr. at 52.) Following this conversation, Mr. Moore sent Plaintiff a salary continuation agreement and asked that Plaintiff execute the agreement and return the signed copies to him. (Tr. at 52; Tr. Ex. 4.) The salary continuation agreement provided that if Plaintiff was terminated without cause prior to September 27, 2001 (Plaintiff's 55th birthday), he would receive a lump sum cash payment equal to the amount of his salary paid from the date he was terminated through September 27, 2001. (Tr. Ex. 4.)

### D. Mr. Doxey begins work at UPC

On March 1, 2000, Robert Doxey replaced Plaintiff as CFO of UPC. (Tr. at 54.) Although Plaintiff was demoted within UPC he still retained the titles Executive Vice President and Treasurer. (Tr. at 42–43.) After Plaintiff began reporting to Mr. Doxey he continued to work on funds management and the portfolio while helping to integrate Mr. Doxey into the organization. (Tr. at 54–55.)

When Mr. Doxey arrived at UPC, he analyzed the bank's balance sheet. (Tr. at 345.) According to Mr. Doxey, he expected Plaintiff, as the corporate Treasurer, to

manage UPC's overall balance sheet, including buying and selling securities, deciding which maturities and the type of securities UPC needed, issuing any debt, managing interest rate risk, and using a funds transfer pricing system. (Tr. at 345.) Mr. Doxey concluded that UPC had an excessive interest rate risk, particularly when he looked at a guideline known as a "shock treatment", which analyzes UPC's net income if interest rates change two hundred basis points (i.e. two percent) in either direction. (Tr. at 346.) According to Mr. Doxey, approximately sixteen percent of the UPC's net income was at risk under the shock treatment scenario. (Tr. at 346; Tr. Ex. 30 at 01048.) Sixteen percent is not out of policy for UPC. (Tr. at 392, 486.) In order to deal with this risk, a bank can sell assets with long-term maturities or use the funds transfer pricing system to encourage branches to grow long-term deposits, which are the responsibilities of the Treasurer. (Tr. at 347–348.)

Mr. Doxey testified that he discussed UPC's funds transfer pricing system with Plaintiff frequently. (Tr. at 349.) He further testified that Plaintiff was told that he was directly responsible for resolving the problems with UPC's interest rate risk. (Tr. at 350.) However, he stated that although Plaintiff agreed UPC needed to put in processes to deal with the problem, Plaintiff never made any progress or took any action to implement a change in the funds transfer pricing system. (Tr. at 350.) According to Mr. Doxey, "[T]hat's my biggest frustration with Mr. Parker is that I needed a game plan on how we were going to get there, and it was always one reason or another that we weren't making progress, but we never really had a firm game plan, and I could not visualize any progress." (Tr. at 350.)[7]

7. UPC ultimately completed implementing a new transfer pricing system in February of 2001 after John Crawford was hired and took over responsibility for the implementation. (Tr. at 383, 386.)

Mr. Doxey also testified that he wanted Plaintiff to securitize some assets to get them off of UPC's balance sheet. (Tr. at 351.) Mr. Doxey wanted to securitize assets so UPC could make progress in decreasing the sixteen percent sensitivity of earnings to a shock treatment scenario. (Tr. at 401.) According to Mr. Doxey, Plaintiff did not make much progress in this area either. (Tr. at 351, 401.) On cross-examination Mr. Doxey admitted that after he had been at UPC for four months, a shock treatment analysis still produced a sixteen percent change in earnings. (Tr. at 400; Tr. Ex. 31 at 00977.) Seven months after Plaintiff left, a shock treatment produced a similar fifteen point four percent change in earnings. (Tr. at 402; Tr. Ex. 32 at 01745.) Mr. Doxey clarified that his problem with Plaintiff was Plaintiff's failure to put tools in place to manage the securitization of assets. (Tr. at 401.)

### E. Mr. Parker's termination

At some point, Mr. Doxey made the decision to terminate Mr. Parker's employment with UPC. (Tr. at 351.) He stated that he alone made the decision, although he did inform Mr. Rawlins and Mr. Moore about his decision before he spoke with Plaintiff. (Tr. at 351.) Mr. Moore testified that Mr. Doxey let him know as a matter of information that he had decided to terminate Plaintiff's employment. (Tr. at 440.) According to Mr. Doxey, neither Mr. Rawlins nor Mr. Moore told him that Plaintiff had a SERP. (Tr. at 352.) Mr. Moore confirmed this fact. (Tr. at 440.) Mr. Doxey also testified that he spoke with Kirk Walters, Chief Accounting Officer at UPC, to get information about what UPC would give Plaintiff as he left the bank. (Tr. at 353.) Kirk Walters did not tell Mr. Doxey anything about Plaintiff's SERP. (Tr. at 353.) Mr. Doxey unequivocally testified that the SERP did not play a role in his decision to terminate Plaintiff. (Tr. at 352.)

On May 25, 2000, Mr. Doxey summoned Plaintiff to his office and informed him that he was being fired. (Tr. at 56.) Mr. Doxey testified that he told Plaintiff the reason for his termination was his failure to make progress on some of the Treasurer's key functions. (Tr. at 353.) Mr. Doxey also testified that duplication of skills was one of the reasons he gave for Plaintiff's termination. (Tr. at 411.) According to Plaintiff, Mr. Doxey cited a duplication of skills as the reason for Plaintiff's termination and that it was not a performance issue. (Tr. at 57.)

According to Plaintiff, Mr. Doxey never criticized his performance and never advised him that he was not moving things along fast enough. (Tr. at 56.) According to Plaintiff, Mr. Doxey also never gave him instructions about managing the balance sheet or expressed dissatisfaction with Plaintiff's interest rate management or management of assets and liabilities. (Tr. at 64, 487.) Plaintiff further testified that Mr. Doxey never criticized the way funds management was operating or complained that Plaintiff was not securitizing assets. (Tr. at 65.) In fact, Plaintiff pointed out that the minutes of the Funds Management Committee Meeting held on May 17, 2000 reflect that UPC completed two securitization transactions and several others were in process or under consideration during the time Plaintiff reported to Mr. Doxey. (Tr. Ex. 8 at 02685.) Plaintiff also testified that Mr. Doxey never criticized Plaintiff's failure to take action to implement a new transfer pricing system. (Tr. at 75.) However, Plaintiff does admit that he met with Mr. Doxey and discussed Mr. Doxey's desire for UPC to implement a newer more sophisticated transfer pricing system. (Tr. at 73–75.)

During the termination meeting with Mr. Doxey, Plaintiff asked Mr. Doxey about his SERP benefits. Mr. Doxey testified that it was the first time he had heard any reference to Plaintiff and his SERP. (Tr. at 354.) Mr. Doxey told Plaintiff to speak with Mr. Rawlins and Mr. Moore about it because he could not answer any questions about the SERP. (Tr. at 58, 355.)

Plaintiff went to see Mr. Rawlins and Mr. Moore later in the day, at which point they confirmed that he was not an eligible participant because he had not reached the age of 55 and, therefore, was not entitled to any benefits under the SERP. (Tr. at 59.) Mr. Moore explained that the salary continuation agreement was a stand alone agreement and did not affect the vesting of the SERP. (Tr. at 59.)

Plaintiff believes that although Mr. Doxey informed him that he was being terminated, Mr. Doxey was "just the messenger" and that he had been terminated by Mr. Rawlins and Mr. Moore. (Tr. at 59–60.) Plaintiff bases this assumption purely on the monetary value of his unvested SERP benefits. (Tr. at 60.) Plaintiff also testified that Mr. Rawlins and Mr. Moore made all of the significant decisions at UPC, which would include an employment decision at his level. (Tr. at 61.) However, on cross-examination Plaintiff admitted that his conclusion that Mr. Rawlins and Mr. Moore participated in the decision to fire him was not based on any specific facts. (Tr. at 158.)

Mr. Doxey concurred that Mr. Rawlins and Mr. Moore were very involved in the management of UPC and were involved in high level decisions. (Tr. at 359.) He also agreed that eliminating a proxy officer is a high level decision. (Tr. at 360.) However, Mr. Doxey unequivocally stated that he made the decision to terminate Plaintiff without discussing the decision with Mr. Rawlins and Mr. Moore. He did not speak with them about it until after he had decided to terminate Plaintiff's employment. (Tr. at 361–362.)

Mr. Moore testified that neither he nor Mr. Rawlins at any time gave Mr. Doxey any instructions to terminate Plaintiff's employment. (Tr. at 439–441.) Mr. Moore testified that neither he nor Mr. Rawlins desired to terminate Plaintiff's employment to prevent the vesting of his SERP benefits. (Tr. at 441.)

At the time UPC fired Plaintiff on May 25, 2000, it was approximately sixteen months prior to Plaintiff's 55th birthday. (Tr. at 35.) After his involuntary termination, Plaintiff made a demand for payment of benefits under the SERP. Plaintiff was informed that he was not entitled to SERP benefits. Plaintiff filed this lawsuit under ERISA to recover the SERP benefits on January 26, 2001.

## II. Conclusions of Law

Pursuant to ERISA Section 510,

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary ... for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan ....

29 U.S.C. § 1140 (2003).

■ To state a claim under ERISA Section 510, a "plaintiff must show that an employer had a specific intent to violate ERISA." *Smith v. Ameritech*, 129 F.3d 857, 865 (6th Cir.1997) (quoting *Humphreys v. Bellaire Corp.*, 966 F.2d 1037, 1043 (6th Cir.1992)). In the absence of direct evidence of such discriminatory intent, a plaintiff can state a *prima facie* case by showing the existence of 1) prohibited employer conduct 2) taken for the purpose of interfering 3) with the attainment of any right to which the employee

may become entitled. *Smith,* 129 F.3d at 865 (quoting *Gavalik v. Continental Can Co.,* 812 F.2d 834, 853 (3d Cir.1987)). In order to establish a *prima facie* case, the employer's allegedly illegal activity must have a causal connection to the plaintiff's ability to receive benefits. *Mattei v. Mattei,* 126 F.3d 794, 808 (6th Cir.1997); *Smith,* 129 F.3d at 865. In order to prevail on an ERISA Section 510 claim, a plaintiff "must prove more than monetary savings for his employer." *Humphreys,* 966 F.2d at 1044. The plaintiff must come forward with evidence that the employer's "desire to avoid [benefits] liability was a determining factor in plaintiff's discharge." *Id.*

■ Assuming the plaintiff can state a *prima facie* case under Section 510, the employer can rebut the presumption of impermissible action by introducing "evidence of a legitimate, nondiscriminatory reason for its challenged action." *Humphreys,* 966 F.2d at 1043 (quoting *Gavalik,* 812 F.2d at 853). This shifts the burden back to the plaintiff to show that the employer's proferred reason was mere pretext. *Smith,* 129 F.3d at 865. "Although the plaintiff need not show that the employer's sole purpose ... was to interfere with [plaintiff's] entitlement to benefits, he must either prove that the interference was a motivating factor in the employer's actions or prove that employer's proffered reason is unworthy of credence." *Smith,* 129 F.3d at 865 (internal citations and quotation marks omitted).

## III. Analysis

Plaintiff argues that the evidence supports a finding that Defendant terminated his employment in order to interfere with the potential vesting of benefits under the SERP. In support of his *prima facie* case, Plaintiff argues that it is implausible that Mr. Doxey was unaware of the SERP and, further, that it is implausible that Mr.

Rawlins and Mr. Moore were not involved in Mr. Doxey's decision to terminate Plaintiff's employment. Plaintiff reasons that UPC wanted to avoid the growing future SERP liability and recoup money it had already put aside in a rabbi trust to fund the future vesting of Plaintiff's SERP.

Plaintiff also argues that UPC's justifications for the decision to terminate his employment constitute pretext. He argues that neither Mr. Doxey, Mr. Rawlins, or Mr. Moore ever criticized his performance or told him that he failed to implement a transfer pricing system or securitize assets. Plaintiff asks the Court to disbelieve the testimony of Mr. Doxey and Mr. Moore and find that UPC terminated Plaintiff's employment with the specific intent to deprive him of potential benefits under the SERP.

Defendant argues that Plaintiff can not establish a *prima facie* case under ERISA Section 510. Defendant argues that Mr. Doxey alone made the decision to terminate Plaintiff, and that he did so without any knowledge of the SERP. Thus, Defendant reasons that the termination decision could not have been motivated by a desire to deprive Plaintiff of potential benefits under the SERP. Defendant also argues that UPC had a legitimate business justification for terminating Plaintiff's employment and that Plaintiff can not establish that this reason is pretextual.

### A. *Prima facie* case

■ The fundamental problem with Plaintiff's case is that he can not establish that Mr. Doxey was even aware of Plaintiff's potential SERP benefits at the time Mr. Doxey decided to terminate Plaintiff's employment. Further, Plaintiff can not establish that Mr. Rawlins or Mr. Moore, who were aware of Plaintiff's potential SERP benefits, participated in the decision to terminate his employment. Without ev-

idence that Mr. Doxey was aware of Plaintiff's potential SERP benefits or that Mr. Rawlins or Mr. Moore directed Mr. Doxey to fire Plaintiff, Plaintiff can not establish a *prima facie* case because there can be no causal connection between the decision to terminate Plaintiff's employment and the existence of the SERP. Furthermore, even if the Court were to find that Plaintiff established a *prima facie* case, his claim would also fail because he has been unable to show that the stated reasons for his termination are pretextual.

The Court could draw many inferences favorable to Plaintiff in this case. However, to draw enough inferences to allow Plaintiff to prevail would require the Court to discredit the testimonies of both Mr. Doxey and Mr. Moore, who were both credible witnesses, and accept the equally credible, but speculative, testimony of Plaintiff as to the reasons for his termination.

Both Mr. Doxey and Mr. Moore specifically testified that Mr. Doxey alone decided to terminate Plaintiff's employment with UPC. Mr. Doxey testified that he had no knowledge of Plaintiff's SERP at the time he decided to terminate Plaintiff's employment. There is no evidence beyond Plaintiff's speculation and unsupported inferences that would justify the Court disregarding this testimony.

For example, Plaintiff argues that it is inconceivable that Mr. Doxey, as CFO, was unaware of Plaintiff's SERP because he reviewed parts of UPC's Form 10–Q before he interviewed for the CFO position. Mr. Doxey testified that he reviewed the 10–Q for information from UPC's financial statements about UPC's size but did not read or even print the exhibits, which included Plaintiff's SERP agreement. Plaintiff further argues that it is inconceivable that Mr. Doxey did not read UPC's March 17, 2000 proxy statement, which reflects Plaintiff's SERP participation, before the April 20, 2000 shareholders meeting. Mr. Doxey testified that he had not read the document because he went to the shareholders meeting for the purpose of talking about the balance sheet and income statement.

Mr. Doxey has offered the Court sufficient explanation on these points and after observing Mr. Doxey at trial the Court believes he testified truthfully on this topic. However, even if the Court disbelieved Mr. Doxey's testimony, Plaintiff has still failed to produce evidence that Mr. Doxey fired Plaintiff with the intent to deprive him of his SERP benefits. Further, there is no evidence that Mr. Moore or Mr. Rawlins directed Mr. Doxey to fire Plaintiff with the intent to deprive him of the SERP benefits.[8] To the contrary, Mr. Moore testified that he did not direct Mr. Doxey to terminate Plaintiff's employment. There is no evidence that the SERP was a motivating factor or even a consideration in the decision to fire Plaintiff. Therefore, Plaintiff has not established the requisite causal connection necessary for the *prima facie* case.

**B. Pretext**

Even if the Court were to find that Plaintiff has established a *prima facie*

---

**8.** The Court also finds it implausible that Mr. Rawlins and Mr. Moore would employ such a roundabout method to prevent the vesting of Plaintiff's SERP benefits. The Court can see no logical reason why they would demote Plaintiff so they could bring in Mr. Doxey and then direct Mr. Doxey to fire Plaintiff all with the specific intent to prevent the vesting of Plaintiff's SERP benefits. Mr. Rawlins and Mr. Moore could have terminated Plaintiff's employment outright at the time they hired Mr. Doxey if they were motivated by a desire to prevent the vesting of his SERP benefits or to recoup monies already paid into the rabbi trust on his behalf.

case, Plaintiff has also failed to make a showing of pretext sufficient to permit a finding in his favor on the issue of liability. Mr. Doxey stated that he decided to terminate Plaintiff's employment because Plaintiff failed to implement a transfer pricing system and because he failed to securitize assets to lower UPC's risk under a shock treatment scenario. These are the legitimate business justifications offered by UPC.

According to Plaintiff's own testimony, when Mr. Rawlins informed Plaintiff that he would be demoted, Mr. Rawlins told him "we've got to get the cost saves, we have got to upgrade our accounting systems ... we're going to improve our budgeting system, we're going to improve our forecasting of earnings system and all those kind of things." (Tr. at 38–39.) Mr. Doxey's desire to implement a new funds transfer pricing system is entirely consistent with this statement.

Both Plaintiff and Mr. Doxey admit that they spoke about the need for a new funds transfer pricing system. They disagree about the extent to which a funds transfer pricing system was a priority and whose responsibility it was to implement the new system. Plaintiff claims Mr. Doxey never criticized[9] his failure to implement a new system, while Mr. Doxey testified that he spoke with Plaintiff about it on a number of occasions. The differences in their testimony establish that Mr. Doxey believed that a new funds transfer pricing system was a priority, but that Plaintiff did not have the same sense of urgency. No progress was made and Mr. Doxey believed Plaintiff was simply discussing the prob-

lem rather than taking action. Mr. Doxey assigned John Crawford to complete the project and a new transfer pricing system was installed by February of 2001. The Court has no reason to question the truthfulness of this justification for Plaintiff's termination; the transfer pricing system was clearly a priority for Mr. Doxey.

Plaintiff's testimony also differs from that of Mr. Doxey on the issue of whether Plaintiff sufficiently pursued the securitization of assets in order to lower UPC's risk under a shock treatment scenario. Again, Plaintiff argues that Mr. Doxey never criticized his failure to securitize assets. Plaintiff notes that the minutes of the funds management committee meeting reflect that he did securitize two pools of assets [10] and had several others under consideration while Mr. Doxey worked at UPC. Plaintiff also argues that even seven months after Plaintiff's departure, UPC's risk under a shock treatment scenario remained substantially the same. The Court agrees that this purported business justification is not completely persuasive. However, in light of the already convincing justification that Mr. Doxey was displeased with Plaintiff's performance as to the funds transfer pricing system, the evidence with respect to asset securitization is insufficient to establish that UPC is offering a pretextual reason for Plaintiff's discharge in order to conceal a hidden agenda designed to deprive Plaintiff of his SERP benefits. The Court will not second guess UPC's decision to terminate Plaintiff's employment where there is a legitimate business justification for the decision.

---

**9.** UPC points out in its response that it would be uncommon for executive level officers of a company to send each other e-mails or written memoranda critiquing each other's capacity to perform their job functions. On this point, the Court is inclined to agree. The Court draws no inference from the fact that there are no written criticisms of Plaintiff's job performance.

**10.** Mr. Doxey testified that these were not securitizations, but the minutes of the meeting do seem to indicate that they were securitizations of assets. (Tr. Ex. 8.)

The Court also heard some testimony regarding the money allocated to the rabbi trust to fund Plaintiff's future SERP benefits. This testimony was, at best, inconclusive. The testimony did not establish, as Plaintiff argued, that UPC recognized an immediate gain to its bottom line from funds recovered from the rabbi trust. Rather, after hearing the testimony the Court has the impression that the only benefit to UPC was that its obligation to make future payments into the rabbi trust for Plaintiff's SERP ceased. This evidence is insufficient to establish pretext.

## IV. Conclusion

For the foregoing reasons, the Court finds that Defendant UPC did not fire Plaintiff with the intent to interfere with his attainment of benefits under the SERP in violation of ERISA. Accordingly, the Court enters judgment in favor of Defendant UPC as to Plaintiff's ERISA Section 510 claim.